## SARAH B. OWEN *vs.* DAVID D. FIELD.

W., the owner of land, on which were springs, entered into an indenture with K. by which he let, granted, sold and conveyed to K. and his heirs "the whole use" of said springs, with the right of laying an aqueduct for the purpose of supplying water to a town, and also the right of entering upon the land at all reasonable times for the purpose of construction and repairs, doing no unnecessary damage; and K. covenanted to furnish to W. and his heirs a reasonable supply of water at his house, "and if by any reason the water should not be delivered in the main pipe for the space of one whole year at one time, this indenture is to cease and be thereafter void and of no effect," K., his heirs and assigns, "retaining the right in that case to take away their pipes, they filling up the trenches and doing no unnecessary damage." *Held,* that this indenture gave K. no right in the soil of W.'s land, but only an easement which was determined by its own limitation on K.'s ceasing for the space of more than a year to deliver water, and taking up his pipes.

B., the owner of land containing four springs and subject to an easement in K. to take the water of said springs by an aqueduct, conveyed the land to H., reserving "the right of laying down other pipe, and taking the waters of said springs, and repairing any aqueduct that said B., or his heirs or assigns, may see fit to lay down and use as per the conditions relating to the present pipe and fixtures." K. was bound by agreement to do no unnecessary damage in laying and repairing the pipes, and to supply water to an estate now owned by F., a third party. *Held,* that this reservation gave B. the right, after the termination of K.'s easement by abandonment according to its limitation, to convey and use the water as K. might have done, but without any obligation to supply F., and that this right was assignable, although B. had no land in the neighborhood, for the benefit of which it could operate.

One who owns land on both the north and south sides of a highway and the fee in the soil of the southern half of the highway, and has laid an aqueduct under the highway from springs on one side to his house on the other, without objection on the part of the owner of the soil of the northern half of the highway, can maintain a bill in equity to restrain one who has cut off the water from the aqueduct.

Equity will restrain a landowner from obstructing the plaintiff in her right to draw water by an aqueduct from springs on his land for the use of her house, if such obstruction is total, is meant to cut her off entirely, and is accompanied with denial of her right, and if her right is ancient, although such right has been until recently exercised by an aqueduct going partly in another direction, laid over land of the defendant by his permission, and used by him, without waiver of right by either party; and although a bill previously brought for the same purpose was dismissed because it did not appear that the plaintiff could then convey the water from the springs to her house without trespassing on the land

of others, if she has since purchased land which enables her to carry the water to her house without any trespass, though such land was purchased for the purpose of renewing the litigation.

On a bill in equity to restrain the defendant from obstructing the right of the plaintiff to take water from four springs on the defendant's lot, it appeared by the master's report that the plaintiff was entitled to take water from four certain springs on the lot distinctly specified in the deed to her, and that she had taken water from four springs on the lot. At the hearing before the full court it was for the first time suggested by the defendant that there was no evidence that the springs from which the plaintiff had taken water were the springs to the water of which she was entitled. *Held*, that, in the absence of evidence of any practical uncertainty or that there were more than four springs on the lot, the possession of the plaintiff must be presumed to be according to the terms of her deed.

A person to whom had been granted by deed the right to draw the water of four springs on the grantor's land by an aqueduct used the water of only two of them for fifteen years; but there was no adverse use of the other two; afterwards he took the two other springs into the aqueduct. *Held*, that the right to the enjoyment of these latter two springs had not been lost by nonuser, and that the remedy of the plaintiff in equity against the defendant for obstructing the use of the springs was not confined to the two springs which he had at first used.

BILL IN EQUITY filed November 2, 1866, setting forth that the plaintiff was owner of a house and land in Stockbridge, and also of four springs on land of the defendant, and that she had a right to have the water from these springs conducted by an aqueduct across the defendant's land to her house; but that the defendant had destroyed the aqueduct and prevented the plaintiff from exercising her said right, doing her irreparable injury. The prayer was for the restoration of the plaintiff's right, for an injunction and for general relief. The answer denied the plaintiff's right and also that she was entitled to relief in equity, and set up the statute of limitations. The case was referred to a master who reported the following facts.

On June 5, 1830, Joseph E. Woodbridge, being owner of a lot of land in Stockbridge on the south side of the Housatonic River, afterwards known as the "Hull lot," on which were four springs, of a homestead lot and house north of the river and between it and the Stockbridge and Lee road, then a turnpike, but which in 1853 became a highway, and of a third lot and house on the opposite side of the road, entered into an indenture, as party of the first part, with Isaac Kellogg, George C. Kellogg, Thomas Dyer and Harvey Case, parties of the second part. This indenture, after reciting that "the parties of the second part have it in contemplation" to conduct the water from the

four springs to the village of Stockbridge, set forth that " to fa-
cilitate said undertaking, and in consideration of sixty dollars
to me in hand paid, and of the covenants and agreements
hereinafter mentioned, the party of the first part, for himself, his
heirs and assigns, lets, leases, grants, sells and conveys to the
parties of the second part, and to their heirs and assigns for-
ever, the whole use of said four springs, and the right and privi-
lege of laying an aqueduct in the usual manner for the purpose
aforesaid across any " of his land on the south side of the road,
and also the right and privilege of making reservoirs, " and also
the right and privilege of entering upon said land at all rea-
sonable and proper times " " for the purpose of making said
aqueduct and reservoirs, and of making all suitable or neces-
sary repairs of the same, doing no unnecessary damage." The
parties of the second part covenanted for themselves, their heirs,
executors, administrators and assigns, with the party of the
first part, his heirs and assigns, to deliver to him, his heirs and
assigns, a reasonable supply of water for the use of two houses
and a barn on his land, the water to be delivered by the first
day of December next, " and to be continued thereafter forever,
subject to the conditions and stipulations hereafter mentioned.
But if there should be a failure of water at the springs, or of
the main pipe leading from the springs to the north side of
the river, the parties of the second part are not to be respon-
sible in damages for not delivering the water in manner afore-
said. And the parties of the second part, for themselves, their
heirs, executors, administrators and assigns, covenant and agree
with the party of the first part, his heirs and assigns, to make an
aqueduct with good leaden pipes from the first reservoir north
of the river or from the main pipes, and conduct the water there-
from to the party of the first part, his heirs and assigns, at the
several places aforesaid, and then they are to be discharged from
the further care and support of that part of the aqueduct lead-
ing from the said first reservoir north of the river, or from the
main pipe, to the several places aforesaid, and the party of the
first part, for himself, his heirs and assigns, covenants with the
parties of the second part, their heirs and assigns, to support and

keep the same in repair thereafter, at his or their own expense. And if by any reason the water should not be delivered in the main pipe, on the north side of the river, for the space of one whole year at one time, this indenture is to cease and be thereafter void and of no effect, the parties of the second part, their heirs and assigns, retaining the right in that case to take away their pipes, they filling up the trenches and doing no unnecessary damage."

Isaac Kellogg and his associates, the parties of the second part under this indenture, soon after its execution, laid an aqueduct supplying the village with water to some extent, as well as both of Woodbridge's houses, as specified in the indenture. This aqueduct was kept in operation, with more or less regularity, and under charge of various persons, for several years. It ceased to supply one of Woodbridge's houses as early as 1840, and there was no evidence that it ran to any other place in the village later than 1840 except to the other Woodbridge house. It was contended by the defendant that the aqueduct supplied water to this latter place as late as 1847, and much evidence was introduced upon the point, " but it failed to satisfy the master of the fact and he cannot state that it did supply water later than 1840." Isaac Kellogg and his associates ceased to repair the aqueduct after 1839; a year or two previous to 1851 they endeavored to sell it and their rights in it; and in 1851 they took up and removed the pipe.

On October 25, 1832, Woodbridge conveyed to Edward Burrall the " Hull lot," on which the springs were situated, by a warranty deed containing this provision : " Hereby reserving from and on said lot above mentioned all the rights and privileges heretofore conveyed by the said Joseph E. Woodbridge to Isaac Kellogg, George C. Kellogg, Thomas Dyer and Harvey Case, their heirs and assigns, by an indenture dated June 5, 1830 " and on. February 9, 1846, Burrall conveyed the Hull lot to David C. Hull by a warranty deed containing this provision : " The said Burrall reserving to himself, his heirs and administrators and assigns, the water of four springs on said land, being the same springs conveyed by Joseph E. Woodbridge to Isaac

and George C. Kellogg, Thomas Dyer and Harvey Case, as per their contract dated June 5, 1830, together with the aqueduct pipe now in the ground on said land, with all fixtures belonging to said aqueduct and springs, with all the privileges named in said agreement of entering upon the land to repair said aqueduct at all times, to take away said pipe and fixtures, and all other privileges conveyed by said agreement. The said Burrall also reserves the right of laying down other pipe and taking the waters of said springs, and repairing any aqueduct that said Burrall or his heirs, administrators or assigns, may see fit to lay down and use, as per the conditions relating to the present pipe and fixtures."

On March 17, 1851, Hull conveyed to the Stockbridge and Pittsfield Railroad Corporation " the right to the sole use and occupancy of" a strip of land running across the Hull lot from east to west north of the springs, " as a roadway and for the purposes of a railroad."

In 1855 the heirs of Hull conveyed to the defendant by warranty deed that part of the Hull lot which lay north of the railroad, between it and the river, " and also the water of the springs on my land south of the railroad, or so much thereof as does not already belong to Daniel Stanton or Edward Burrall, together with the right to build and maintain an aqueduct to the same; " and in 1864 the heirs of Hull conveyed to the defendant that part of the Hull lot which lay south of the railroad, " reserving all rights to springs and the right to take them, lay down, take up and repair aqueduct, &c., which Edward Burrall reserved in his deed to David C. Hull, dated February 9, 1846."

Burrall by deed dated April 1, 1847, conveyed to Isaac Brown three parcels of land in Stockbridge. The first has nothing to do with the present case; the second was a narrow strip running from the Stockbridge and Lee road to the Housatonic River opposite to the third parcel; the third parcel lay on the south side of the Housatonic River and adjoined the west side of the Hull lot. The deed contained this provision: " The said Burrall reserves to himself, his heirs, executors, administrators and assigns, all the lead pipe belonging to an aqueduct in or on the

ground or in the river, on the two last described lots of land; also, the right of continuing in the ground and in the river, and also of laying down pipe through the lane or second piece of land from the river to the said turnpike road. Said Burrall also reserves the right of entering upon the last two pieces of land, by himself and hired men, for the purpose of laying down pipe and repairing said aqueduct; he also reserves the right of making a reservoir for said aqueduct, on the lot on the south side of said river; also reserves the right of entering upon the last two pieces of land, by himself and hired men and teams, for the purpose of taking up and carrying away all of said lead pipe, aqueduct and fixtures belonging to the same, he leaving the land smooth and in good order. The three above described parcels of land are hereby conveyed with all the privileges and appurtenances belonging to the same, subject to the above reservations." The title to the second and third parcels, known respectively as the " Brown lane " and the " Brown lot," became, by mesne conveyances, vested in the defendant.

On March 25, 1845, Burrall, who was at that time the owner of two lots of land to the north of the Stockbridge and Lee turnpike, one on the east side of a road leading from the turnpike to Jones's Hill, and the other on the opposite side of said road, (the former lot being the one now belonging to the plaintiff,) conveyed to Horatio Byington the latter lot and " also the aqueduct pipes and appurtenances on the premises, and the pipes across the west half of the road leading to said Jones; also one half of the water of the springs on the land of said Burrall, lying eastwardly of the land hereby conveyed, and a right in the aqueduct on the land of said Burrall and on the east half of said road, leading to said Jones, through which the water is now conducted, for the purpose of conducting the water on to the premises hereby conveyed; also a right of entry on the land of said Burrall, for the purpose of putting down and repairing said aqueduct and spring, leaving the land of said Burrall and premises in as good order as when entered upon." The spring mentioned in this deed has no reference to any of the springs on the Hull lot, but to a spring on that other lot of

Burrall to the north of the turnpike, which now belongs to the plaintiff. This spring has been dry during a part of several years.

This other lot of Burrall's to the north of the turnpike consisted of two parcels separated by a highway running at an angle from the turnpike and leading to Lenox, so that one of the parcels, called "the triangle," lay between the turnpike and the Lenox road, and the other lay between the Lenox road and the road to Jones's Hill above mentioned.

Burrall, by deed dated November 7, 1851, conveyed both these parcels to Junius D. Adams, who, by deed dated November 20, 1851, conveyed them to Daniel Stanton. In these deeds the former parcel was bounded beginning at the junction of the turnpike with the Lenox road, thence on the Lenox road five rods to a stake, thence south 4° west by land of Hinckley "to a stake in the north line of the turnpike road, thence north 84° west four rods to the place of beginning;" and Burrall, by a quitclaim deed, dated March 23, 1853, released to Stanton all his "right in and title to the water of four springs, the springs and the land connected therewith necessary for the enjoyment and use of the same, being the springs mentioned and intended" in the indenture between Woodbridge and Isaac Kellogg and his associates, "and reserved in a deed of land to David C. Hull given by me dated February 9, 1846," "with all the rights of entering upon the land so conveyed to Hull for the purpose of taking away the water of said springs, laying down aqueduct pipe, repairing, or for the purpose of doing any other act or thing in any wise touching said springs or the land so conveyed to said Hull, which I reserved to myself in and by said deed." The deed also quitclaimed and released to Stanton all the rights reserved by Burrall in his deed to Brown above mentioned, and also all his right, title and interest in the land over which the Lenox road passed.

There was evidence tending to show that Burrall, at the time of his giving this quitclaim deed to Stanton, had no real estate in Stockbridge, except a distant piece of swamp land. On December 19, 1860, Stanton conveyed to the plaintiff the premises

Owen *v.* Field.

conveyed to him by Adams by the deed of November 20, 1851, and also all the rights, privilege and estate conveyed to him by Burrall by the deed of March 23, 1853.

Woodbridge conveyed to Caleb Hyde his lot of land on the south side of the turnpike by a warranty deed dated February 20, 1833, and containing the following provisions: " And I do also sell, assign and make over to the said Caleb Hyde, all the rights and privileges to which I am entitled by virtue of " the indenture of June 5, 1830, with Isaac Kellogg and his associates, " to have water delivered by them at my barn yard and at my dwelling-house on the premises hereby conveyed to the said Caleb Hyde, and also the right of enforcing all the covenants and agreements contained in said indenture and obligation, on the parties of the second part, relating to the delivering of the said water to the two places above named, as fully as I now possess the same. And it is expressly understood and agreed by the parties to this instrument, that the above described land is hereby conveyed to the said Caleb Hyde, subject to all the rights and privileges granted in and by said indenture by me to the said Isaac Kellogg and others: and that the said Caleb Hyde, his heirs and assigns, will allow, do and perform all things which I, the said Woodbridge, am bound by said indenture to allow, do and perform in relation to the aqueduct mentioned in said indenture, and to the water to be delivered at the two places aforesaid, and to the support of the said aqueduct and pipes, so far as they are connected with the above conveyed land, and with the conducting and delivery of the water at the two places above named." The premises conveyed by this deed had become vested in the daughter of the defendant.

In 1855 Stanton, who then owned the premises now belonging to the plaintiff, laid an aqueduct " taking the water of two springs on the Hull lot to said premises." This aqueduct between the river and the Stockbridge and Lee road passed over other land of the defendant not hereinbefore described. At a conference with the defendant some time before the aqueduct was laid, Stanton claimed the right to lay the aqueduct, which the defendant did not admit; but the parties agreed that Stan-

ton might lay down the line, as he afterwards did, on condition that the defendant might lay a pipe from the aqueduct to supply his house and barn, and in pursuance of this agreement the aqueduct and pipe were laid down and used, " neither party waiving their legal rights in the premises." When the plaintiff purchased her estate from Stanton she " took two other springs into the aqueduct," and continued to use it till July 1866, when she cut off the pipe leading to the defendant's house, whereupon the defendant took up that part of the aqueduct which crossed his land between the river and the Stockbridge and Lee road, and forbade the plaintiff to interfere with the water of the springs.

The plaintiff filed, on July 26, 1866, a bill in equity against the defendant to restrain him from disturbing her rights to the springs; but this bill was dismissed, as appears by the report in 12 Allen, 457, because she failed to show that, even if the defendant did break up the aqueduct, she had the right to conduct the water to her own land without trespassing on the land of others. The plaintiff had previously, on November 10, 1864, purchased a small lot of land, known as the Thompson lot, on the south side of the Stockbridge and Lee road, opposite the parcel called the triangle, above mentioned, conveyed to her by Stanton. The deed conveying this lot bounded it north on the Stockbridge and Lee road. By deed dated September 28, 1866, the plaintiff purchased from Patrick Lawless a strip of land one rod wide leading from the south side of the Thompson lot to the river, there terminating opposite to the Hull lot. The plaintiff purchased this strip of land from Lawless solely for the purpose of obtaining a way by which she might lay her aqueduct from the Hull lot to her house, and she testified that when she bought this strip she " knew there was a possibility of a lawsuit with the defendant, and a probability of it." Soon after this purchase she changed the course of the aqueduct, carrying it across the Hull lot, the river, the strip purchased from Lawless the Thompson lot, the Stockbridge and Lee road, the triangle and the Lenox road, to her house. This new line left the line laid down by Stanton at a point on the Hull lot, and joined it

again at a point on the Stockbridge and Lee road. On the same day on which this line was completed, the defendant broke it by taking up some pipes on the Hull lot.

The aqueduct laid down by Stanton as well as that laid down by the plaintiff were carried under the Stockbridge and Pittsfield Railroad on the Hull lot. The president of the railroad company testified that he knew of no authority having been given to run the Stanton aqueduct across the railroad, but that he did not know that it disturbed the railroad and that he had never made any objection.

Woodbridge, by deed dated September 25, 1865, released to the plaintiff " all my rights and title to four springs of, and right of soil for laying aqueduct pipes, together with rights now possessed by me in " the indenture between him and Isaac Kellogg and others of June 5, 1830.

The case was reserved by the chief justice, on the pleadings and master's report, for the determination of the full court.

*I. Sumner & M. Wilcox,* (*H. L. Dawes* with them,) for the plaintiff.

*H. Morris,* (*A. J. Waterman & H. J. Dunham* with him,) for the defendant. This suit does not call for the interposition of a court of equity. The plaintiff's possession has not been long continued. *Reid* v. *Gifford,* 6 Johns. Ch. 19; *S. C.* Hopkins, 416. *Robinson* v. *Byron,* 1 Bro. Ch. 588. *Blakemore* v. *Glamorganshire Canal Navigation,* 1 Myl. & K. 154, 185. *Gardner* v. *Newburgh.* 2 Johns. Ch. 162. *Von Bergen* v. *Von Bergen,* 3 Johns. Ch. 282. *Arthur* v. *Case,* 1 Paige, 447. *Case* v. *Haight,* 3 Wend. 632. *Belknap* v. *Trimble,* 3 Paige, 577. She has an adequate remedy at law. She cannot carry the water to her own premises without trespassing on land of others. *Owen* v. *Field,* 12 Allen, 457. Any right of the plaintiff has been lost by lapse of time. The reservation in the deed of Burrall to Hull was not a new and independent reservation. Even if Burrall intended to reserve for himself new water rights, he had no such rights to reserve. The rights to the water had vested in Isaac Kellogg and his associates ; it is true that they held them on a condition, which had been broken, but the grantor had

never taken advantage of that breach of condition, and no one else could. *Rice* v. *Boston & Worcester Railroad Co.* 12 Allen, 141. *Brattle Square Church* v. *Grant,* 3 Gray, 142. *Parmelee* v. *Oswego & Syracuse Railroad Co.* 2 Selden, 74. *Stuyvesant* v. *Davis,* 9 Paige, 427. *Phœnix* v. *Commissioners of Emigration,* 12 How. Pract. 1. *Nicoll* v. *New York & Erie Railroad Co.* 2 Kernan, 121. When Burrall had conveyed away all the land for which the water rights would have been valuable, those rights terminated. *Wolfe* v. *Frost,* 4 Sandf. Ch. 72, 89. *Post* v. *Pearsall,* 22 Wend. 425, 432. *Manning* v. *Wasdale,* 5 Ad. & El. 758. *Race* v. *Ward,* 4 El. & Bl. 702. *Rowbotham* v. *Wilson,* 8 El. & Bl. 123. *Ackroyd* v. *Smith,* 10 C. B. 164. *Stockport Water Works Co.* v. *Potter,* 3 H. & C. 300. The deed from Woodbridge to the plaintiff could convey no rights.

AMES, J. The rights of these parties depend mainly upon a large number of deeds, some of which are not drawn up with much professional skill and precision; and some present quei.-tions of construction of considerable importance and difficulty.

Of these deeds, the earliest in date, and perhaps the first in importance, is the indenture of June 5, 1830, between Joseph H. Woodbridge of the first part, and Isaac Kellogg, George C. Kellogg, Thomas Dyer and Harvey Case, of the second part. Said Woodbridge was at that time the owner of the dwelling-house and homestead lot now belonging to the defendant or his family; also of another lot and dwelling-house on the opposite side of the road known as the Stockbridge and Lee turnpike; and of the Hull lot, as it has since been called, upon which the four springs in controversy are situated, and which now also belongs to the defendant. Whether he is the owner of this last mentioned lot, in such a manner and by so full a title as to make him also owner of the springs, with full power to control and appropriate the water furnished by them, is one of the matters most seriously controverted in the case. This indenture, after reciting that " the parties of the second part have it in contemplation " to conduct the water from the springs by an aqueduct to the village of Stockbridge, sets forth that " to facilitate said undertaking," and in consideration of sixty dollars, and of the

covenants and agreements of the parties of the second part therein mentioned, said Woodbridge, " for himself, his heirs and assigns, lets, leases, grants, sells and conveys to the parties of the second part and to their heirs and assigns forever, the whole use of said four springs" with the right of laying· an aqueduct, " for the purpose aforesaid," and constructing reservoirs, and also of entering upon the land, at all reasonable times, for the purpose of construction and repairs, doing no unnecessary damage. The other parties covenant to furnish to him, his heirs and assigns, a reasonable supply of water at both his houses and at his barn, by means of an aqueduct and good leaden pipes, by the first day of December of that year, to be continued forever thereafter, (unless there should be a failure of water at the springs, or of the main pipe leading from them to the north side of the river,) the pipes to be kept in repair by said Woodbridge, his heirs, &c. Then follows a clause, the construction of which has become a matter of importance, and which is expressed in these words : " And if by any reason the water should not be delivered in the main pipe, on the north side of the river, for the space of one whole year at one time, this indenture is to cease and be thereafter void and of no effect, the parties of the second part, their heirs and assigns, retaining the right in that case to take away their pipes, they filling up the trenches and doing no unnecessary damage."

The master's report finds that, under this indenture, Isaac Kellogg and his associates constructed the aqueduct, supplying the village with water to some extent, and also supplying Woodbridge's houses according to the terms of their covenant. He reports also that, although the matter was controverted at the hearing, it was not proved that it supplied either of Woodbridge's houses after 1840, and that there was no evidence that it ran to any other place in the village after that year. The grantees made no repairs upon it after 1839; and after several unsuccessful attempts to dispose of their interest in the property, they finally in the year 1851 took up and removed the pipes, and have never since exercised or claimed any right in the premises. It does not appear that they have ever been called upon since

that time to fulfil any obligation on their part expressed in the indenture.

The defendant insists that the grant contained in the indenture is not a grant of a mere easement, or incorporeal right, but a grant of land in fee, defeasible on breach of a condition subsequent, conveying land itself, and not a mere privilege, or right of use, in the land of the grantor. By the terms of the instrument, Woodbridge " grants, sells and conveys to the parties of the second part, and to their heirs and assigns forever, the whole use of the four springs," with the incidental right of laying down an aqueduct across and through the adjacent land, and of entering for the purpose of construction and repairs. Woodbridge, by the terms of his contract, appears to have cut off himself and his heirs forever (if the indenture should continue in force) from all personal control over the waters of the springs. He makes no technical reservation or exception in his grant; and it may perhaps be contended that, for his supply of water from that source, he leaves himself wholly dependent on the covenant of the other parties, that they will deliver it in reasonable quantity, by means of pipes, &c., on his grounds. The defendant contends that a grant of the exclusive use or control of the four springs forever is in its legal effect precisely equivalent to a grant of the springs themselves, and that it is a well established rule that, in a grant or reservation, the use of a general descriptive term, applicable only to the purpose for which the land is used at the time of the grant, is sufficient to pass the land in fee, so far at least as may be necessary to the enjoyment of, or commonly used with, the thing expressly granted. Thus the grant or reservation of a mill has been decided to include not only the mill itself, but the land under it and so much of the land adjacent to it, as is necessary to its use, or commonly used in connection with it. *Forbush* v. *Lombard,* 13 Met. 109. A grant of a well has been held to pass a fee in the land occupied by the well. *Johnson* v. *Rayner,* 6 Gray, 107. A grant of a " town pound " includes the land on which the pound is situated. *Wooley* v. *Groton,* 2 Cush. 305. A mortgage of the stone foundation of an unfinished house has received the same interpretation. *Greenwood* v. *Murdock,* 9 Gray, 20.

If the defendant's construction of the grant must be taken as true, it would follow that a deed of warranty, by which Woodbridge should afterwards undertake to convey in fee, to some third person, the lot of land in which the springs are situated, would, so far as the springs are concerned, be an attempt to grant a fee upon a fee, and would therefore, to that extent, pass no title and be of no avail. 2 Washb. Real Prop. 225.

But on full consideration we cannot adopt the defendant's construction of the indenture. The terms of the grant are appropriate to the purpose of giving to one party a right to be exercised in the land of another, and do not necessarily imply a conveyance of the soil in fee. *Arnold* v. *Stevens*, 24 Pick. 106. Co. Lit. 4 b. The effect of it is to subject Woodbridge's tenement, or lot of land, described in the case as the Hull lot, to the burden of a restriction from doing upon it what he otherwise could do, and an obligation to suffer others to use it in a manner which he might otherwise prevent. This court has defined an easement or servitude to be " a right which one proprietor has to some profit, benefit or lawful use, out of or over the estate of another proprietor." *Ritger* v. *Parker*, 8 Cush. 145. Woodbridge, the proprietor of the land, conveys to the parties of the second part, the proprietors or intended proprietors of aqueduct works, a right which was supposed to be valuable, and was intended to be permanent. It was a benefit or use to one party in the land of another, and falls literally and exactly within the established definition of an easement. The indenture does not in terms purport to convey the springs themselves, but the use of them ; and the whole indenture taken together describes the purpose and the manner of the use. It is a grant of the whole use of the springs forever, but for the purpose of supplying the village with water, and the mode of exercising that use is by conducting the water from the springs to the village by means of pipes. It recites that the parties of the second part have it in contemplation to conduct the water from the springs, by an aqueduct, to the village, and in order " to facilitate said undertaking " he grants, &c., the whole use of the springs, and the right and privilege of laying an aqueduct in the usual man-

ner, " for the purpose aforesaid," across his lands. There is nothing to indicate that there was to be any other use by the grantees, or any use of the water at the springs. Undoubtedly the grant would give them so much right and interest in the soil as was reasonably necessary to the beneficial enjoyment of that grant. They apparently have no more reason for saying that the fee simple of the soil, under and around the springs, is vested in them, than they would have for saying that the soil, under and inclosing their pipes and reservoirs, is vested in them, by the terms of the indenture. " The use of the springs," taken in connection with the rest of the instrument, can only mean the right to appropriate the water, wholly or in part, by conducting it by means of an aqueduct to the places where it is to be distributed. It is to be remembered that running water is not of itself the subject of a grant. The case differs very widely from those above cited of the grant of a mill, or a well. There can be no exclusive enjoyment of a mill, or a well, or any other permanent and irremovable fixture so attached to the soil as to be a part of the realty, without the exclusive control of the soil on which it stands, and therefore the law implies that so much of the soil is included in the grant as may be necessary to its existence, or beneficial enjoyment. But the necessity is the measure and limit of the implication. Here there is no such necessity, inasmuch as the use of the springs does not require, or as a matter of course include, the fee in the soil.

Moreover the parties have expressly provided by their contract, that, upon the happening of a certain contingency, the indenture is to cease, and be thereafter void and of no effect. If these words were contained in a deed poll, they might create a condition subsequent, on the breach of which the grantor might enter and repossess himself as of his former estate. But this instrument is an indenture, containing mutual stipulations. The parties of the second part not only receive a grant, but they enter into covenants and assume obligations. The condition is not merely for the protection of the grantor, but it also operates for the relief of the grantees. The contract does not provide

merely for the failure of the source of supply, or the breaking down of any of the pipes or fixtures. On the contrary the provision is that "if by any reason the water should not be delivered in the main pipe, on the north side of the river, for the space of one whole year at one time, this indenture is to cease," &c. It seems to us that the obvious intention of this clause in the indenture is to provide for the contingency (which has in fact occurred) that the enterprise might prove unsuccessful or burdensome to the grantees; that it allows them to relieve themselves from their obligations and covenants by a voluntary and intentional surrender of the right conveyed to them, and that they are at liberty in that event to remove so much of their investment in the undertaking as admits of removal. The event on which the indenture was to cease, and thereafter to be void and of no effect, was entirely in their control. They were at liberty to dig up their pipes and abandon the enterprise, whenever they found it for their interest to do so. The effect of the indenture seems to be that it gave a license or authority to the parties of the second part, to be exercised as long as they should see fit; or more properly, that it granted to them an easement, and imposed upon them certain obligations, terminable, at the pleasure of the grantees, by a nonuser kept up continuously for the term of one year. The last clause of the indenture should be construed, not as a condition subsequent, but as a limitation. The difference is quite material. "A limitation doth always determine the estate without entry or claim, and so doth not a condition." Also "a stranger may take advantage of an estate determined by limitation, and so he cannot upon a condition." Shep. Touch. 121. "The apt and proper words to make a limitation of an estate are *quamdiu, dum*," &c.; and in this case the word "if," although used in the grant, is not sufficient of itself to render it a grant defeasible on condition subsequent. The substance of the clause is not the forfeiture of a right, but the termination of an onerous and unprofitable obligation.

If we are right in viewing the contract as the grant of an easement in the strict sense of the term, (and of this we think there can be no doubt,) it would follow that, on the extinguish-

ment of the easement, or its termination by the limitation provided for in the deed, the use and control of the springs would go back to the owner of the soil in which they were situated, and his title, and that of all claiming under him, would be exactly the same as if the easement had never been granted. It is difficult to see how there could be a more manifest and unequivocal abandonment of an easement of this kind, than is found in the fact that the grantees not only ceased for years together to make use of it, but at last dug up and carried away all the pipes and fixtures necessary to its use, leaving the springs, and the land on which they were situated, as nearly as possible in their original condition.

If then the indenture is to be considered as containing a grant by Woodbridge of an easement in the Hull lot, terminable on a certain agreed limitation, and not a defeasible or conditional fee in any of the land itself, it would follow that he continued to be the general owner of the lot, including the springs, subject only to the right or easement which he had granted. He then proceeds, by his deed of warranty, dated October 25, 1832, to convey the Hull lot to Edward Burrall. The deed contains what it describes as a reservation of all the rights and privileges which he had previously conveyed to the Kelloggs, Dyer and Case. But this so called reservation, as both parties agree, is not properly so called. It is an exception, and not a reservation. The grantor conveys all the title that it was in his power to convey; he reserves nothing whatever to himself. Its whole meaning is, that he does not undertake to convey to Burrall the rights in the springs which he had previously conveyed to another party; and the effect of the deed is to make Burrall the general owner of the lot, subject to the easement.

The next step in the history of the title to the springs is a warranty deed from Burrall to David C. Hull, dated February 9, 1846, conveying the Hull lot, with however an important exception or reservation, the true interpretation of which has been a matter of no little controversy. It is to the effect that Burral reserves to himself, his heirs, &c., the water of four springs, being the same springs conveyed by Joseph E. Woodbridge to the

Kelloggs, Dyer and Case, as per their contract dated June 5, 1830, together with the aqueduct pipe now in the ground, with all fixtures, &c., and all the privileges named in said agreement, conveyed by said agreement. The defendant insists that this clause, although the grantor uses the expression "reserving to himself," cannot be considered as really a reservation. He insists that it is merely the excepting, out of the deed from him, of the same things that were excepted out of the deed to him; that the things described in this clause were things that he could neither grant to any one else, nor reserve to himself, for the reason that they belonged, not to him, but to the Kelloggs, Dyer and Case, and that this clause in the deed is to be construed as an exception, and not as a reservation. But, in the construction of the deed as a whole, the circumstances under which it was made are to be considered. It is found as a fact by the master that the Kelloggs and their associates had made no repairs on the aqueduct for about six years; and it is apparent from his report that the enterprise of supplying the village with water was not in a promising condition, and possibly that the contingency upon which the indenture was to cease and become void had already occurred. It is at least possible that Burrall may have anticipated its early discontinuance, and it may well be inferred, from what appears on the face of the deed itself, that he was not ignorant of the terms of the indenture of June 5, 1830. But however that may be, a clause follows that already commented upon, which certainly must operate as a reservation, and take effect as such, upon the final abandonment of the easement in 1851. "The said Burrall also reserves the right of laying down other pipe and taking the waters of said springs, and repairing any aqueduct that said Burrall or his heirs," &c., " may see fit to lay down and use as per the conditions relating to the present pipe and fixtures." We think this reference to "the conditions relating to the present pipe and fixtures" is to be understood as meaning that he reserves to himself the right to control the water of the springs, and to convey it from the lot of land in question, in the same manner as is provided for in the indenture so often referred to. The effect of this deed then would

be, that David C. Hull became the owner of the lot in fee, but without the right to control the water of the springs; and the abandonment of the easement by the Kelloggs and their associates in 1851, if not at an earlier date, would vest the same easement in the hands of Burrall, by virtue of the reservation contained in his deed to Hull. According to the decision of this court in the recent case of *Goodrich* v. *Burbank*, 12 Allen, 459, this would be a right in gross, transferable and descendible, not necessarily annexed to any particular estate, or limited as to the place or manner of its enjoyment. The title which the plaintiff has derived from Burrall, through Stanton, her grantor, is quite enough to give her a right to conduct water from the springs to her dwelling-house, provided she has obtained such a control of the intermediate lands that she can lay down her aqueduct pipes for that purpose. On the other hand, it is very manifest that the deeds, by which the defendant became the owner of all that the heirs of David C. Hull could convey to him in the Hull lot, would not convey to him any title to a control over the waters of the spring. Hull had no such title himself, and of course could convey none; and his heirs, in their deeds to the defendant, do not undertake to convey such right, or to warrant against any right in the springs on the part of Burrall or persons claiming under him by virtue of the reservation in his deed to David C. Hull. It will be observed also that by the reservations or exceptions (whichever they may be called) contained in Burrall's deed of April 1, 1847, to Isaac Brown, he kept in his own hands a right of way for an aqueduct through the " Brown lot" and the " Brown lane," from the springs as far as the turnpike. The fact that he had substantially parted with all his lands in Stockbridge before he quitclaimed his rights in the springs to Stanton, in the light of the decision in *Goodrich* v. *Burbank, ubi supra*, may well be considered immaterial.

In the former suit between these parties, reported in 12 Allen 457, the plaintiff failed to obtain the relief prayed for, on the ground that " she had failed to show that, even if she were permitted by the defendant to exercise the right which she claims, without obstruction, she has any such right to continue the

aqueduct to her own land, as would enable her to bring the water to her house, or give her any beneficial enjoyment of it." In this respect, however, the plaintiff, since that trial, has materially strengthened her position. She now has laid down her aqueduct within the limits of the Hull lot, and, passing under the track of the Stockbridge and Pittsfield Railroad Company, to the Housatonic River. As her title under Burrall's reservation is older and better in that respect than any title which Hull could convey to that corporation, she so far does not go beyond her legal rights. It may be proper also to say that in so doing she does no injury to the track of the railroad, and is not met by any objection on the part of its proprietors or managers. This right, as derived from Burrall, would carry her as far as his line would extend in that direction, that is to say, to the thread of the river, at which point she comes to the boundary of her own land, namely, the lot recently purchased of Lawless. She then continues the line through that lot, and through another lot of land of which she is also the owner, called the Thompson lot, to the Stockbridge and Lee highway, formerly a turnpike. The line is then still further continued in like manner under this. highway, passing through another lot belonging to her, and described in the report of the master as the " triangle," and then under another highway, till it reaches her dwelling-house. The plaintiff has title in the soil under the second highway by distinct grant thereof, and under the southern half of the first highway by virtue of the deed to her bounding the lot of land on that side " on the road." It does not clearly appear in whom is the title of the soil under the northern half of this road. With this exception, the plaintiff has acquired such a control over the land intermediate between the Hull lot and her own dwelling-house, that she can lay down a continuous line of aqueduct the whole way without trespassing upon the land of any other owner, or needing the permission of anybody. And if a portion of the aqueduct has been laid, either by sufferance or by trespass, across a highway passing over land of which the fee belongs to some other person, the defendant has no right to interrupt it, or to complain of such a trespass. Within the limits of the Hull lot,

the plaintiff was entitled, under the reservation in Burrall's deed so often referred to, to lay down any aqueduct that she might reasonably see fit, in order to avail herself of her rights. The fact that she has very recently purchased a portion of the land necessary to the continuity of her line of aqueduct, and that she did so in order to remove the difficulty under which she labored in her former suit, and with a view to renewed litigation with the defendant, in our opinion does not interfere with or impair her claim to relief, as prayed for in the present bill. If she has the rights in the use of the springs which she claims, the defendant has no cause to complain that she has acquired, by purchase, such control over the intermediate lands as she finds necessary to the beneficial enjoyment or successful assertion of those rights.

Among the deeds, the construction of which has become matter of controversy, is one from Joseph E. Woodbridge to Caleb Hyde, dated February 20, 1833, conveying to said Hyde the estate and homestead now in the ownership and occupation of the defendant or his family. This deed, which contains the usual covenants of a warranty deed, purports to convey to Hyde, with the house and land, all the rights and privileges which said Woodbridge was entitled to under and by virtue of the indenture with the Kelloggs and their associates, already referred to, and the right of enforcing all the covenants and agreements contained in that indenture and obligatory on the parties thereto of the second part, "relating to the delivering of the said water to the two places" named in the indenture, "as fully as" said Woodbridge "now possesses the same." The deed also recites that the conveyance to Hyde is subject to all the rights and privileges granted by the indenture to the Kelloggs and their associates, and that Hyde is to allow, do and perform all that Woodbridge was bound by the indenture to allow, do and perform in relation to the aqueduct, and to the support of the aqueduct. The defendant claims that, having acquired all the title which Hyde had and enjoyed by that deed, he has acquired, as one of the appurtenances of the estate, the right to appropriate to that estate the use and control of the waters of the springs. But, by his deed to Hyde, Woodbridge only undertook to convey, with

the land, the rights and privileges belonging to him under the indenture, and the right of enforcing the covenants in his favor obligatory upon the Kelloggs and their associates. Upon the termination of their estate in the right to the use of the springs, by the happening of the event upon which, by express previous agreement and limitation, the indenture was "to cease, and be thereafter void and of no effect," and they were to be at liberty to remove their fixtures and apparatus, all the rights and covenants dependent upon their estate, and all the privileges of Woodbridge and those claiming under him, under and by virtue of the indenture, must also cease. The indenture being terminable by its own limitation, all rights, privileges and benefits in favor of other persons, and dependent upon it, must be terminable in like manner and upon the same limitation. For that reason it is difficult to see how the privileges under the indenture conveyed by Woodbridge to Hyde can be of any practical advantage to the defendant, for the purposes of the present case.

The deed from Burrall to Byington, dated March 25, 1845, appears to have no particular bearing upon the case at bar. Burrall was at that time the owner of the dwelling-house and homestead now belonging to the plaintiff, and the deed to Byington only shows that those parties at that time intended to rely upon an entirely different source for their supply of water. We find nothing in that deed to affect the plaintiff's claim, or to prevent her from looking to a new source of supply afterwards, if she chose to do so.

We have no doubt that this case falls within the equity power of the court, and presents a proper occasion for the exercise of that power. The defendant not merely obstructs the plaintiff's aqueduct, and so interrupts its use for the time being, (for if that were all, such damages as she might recover in an action at law might be a sufficient and adequate indemnity,) but he wholly denies her right, has taken up her aqueduct, forbidden her to interfere with the water of the springs, and intends entirely to cut off the communication between her dwelling-house and them. She has made out a full right to the use of the water, and has also satisfied us that she has no adequate and complete

remedy at common law. The right under which she claims
is not one of recent origin, but dates back certainly as far as
March 1853. It is true that she has been under the necessity
of changing a portion of her aqueduct, and diverging for a con-
siderable part of the entire course from the line originally laid
down by her immediate grantor, Stanton, but the termini of the
line and the right under which she has claimed have always
been the same that they are now. It is true, also, that during
part of the time since her title accrued she has enjoyed the use
of the right in common with the defendant, and in crossing his
land· has done so by his permission, " neither party waiving their
legal rights in the premises." It is apparently, then, a case of
established enjoyment for years together, under a claim of right
on her part, and a violent interruption of that enjoyment by
the defendant; and she is in our judgment entitled to relief in
equity as prayed for.

It will be seen that we have attached no particular impor-
tance to the quitclaim deed from Woodbridge to the plaintiff,
dated September 25, 1865, as it is very doubtful, to say the least,
whether he at that time had any title in the springs which he
could convey by that deed.

In conclusion, we feel bound to say that we have been greatly
assisted in our examination of the case by the very full, elabo-
rate and careful report of the master, and that we see no cause
for reversing or qualifying any of his decisions.

*Decree accordingly.*

The draft of the decree drawn up after the delivery of this
opinion provided, among other things, first, that the defendant
be enjoined and restrained from removing the aqueduct or in-
termeddling therewith ; and secondly, that the plaintiff might
" conduct, have and receive, use and enjoy the waters of the said
springs." · The defendant desired to alter the draft by adding
to the first above mentioned provision the words " so long as
the plaintiff fulfils the conditions mentioned in " the deed from
Burrall to Hull of February 9, 1846; and by striking from·
the second above mentioned provision the word " said," and by

adding to said provision the words " used and enjoyed by the plaintiff's predecessor, Stanton," so that said provision might read that the plaintiff might " conduct, have and receive, use and enjoy the waters of the springs used and enjoyed by the plaintiff's predecessor, Stanton.".

On the points raised by these proposed alterations, a further argument was had in writing.

*I. Sumner & M. Wilcox,* (*H. L. Dawes* with them,) for the plaintiff.

*H. Morris & A. J. Waterman,* (*H. J. Dunham* with them,) for the defendant, contended that the plaintiff was entitled to use only the two springs used by Stanton ; that she could use the springs only under the conditions set forth in the indenture between Woodbridge and Isaac Kellogg and others ; and, if the point was open to them on this hearing, that the clause at the end of the said indenture, concerning the ceasing of the water for a year, was a condition, and not a limitation.

AMES, J.    Upon the attempt to draw up the final decree in this case, it was suggested that there were a few points which seemed to have been left by the judgment not entirely free from controversy, and it has been thought expedient, as to those points, to hear further argument from counsel.

It appears from the master's report that the aqueduct, as used by Stanton, conducted water from two springs only ; and that the plaintiff, since the dispute between these parties began, has taken the water of two other springs into her aqueduct.    The defendant now objects that it does not appear that these two springs last mentioned were among the four that are referred to in her title deeds.    But the four springs are described with much precision in the Kellogg indenture, and the same description appears to have been adopted, by reference to that indenture, in all the subsequent deeds.    The master's report certainly implies that the four springs which the plaintiff claims are the same four that are referred to in the entire chain of conveyance.    No question as to their identity appears to have been raised at any previous stage of the case.    In the absence of all evidence of any practical uncertainty upon the subject, and of all reason to infer

from the report that there are more than four springs upon the lot, we must assume that her possession, taken under a deed containing a definite and clear description, is in accordance with her deed.

As to the alleged forfeiture of her right to make use of the two springs recently taken into the aqueduct, it is to be remembered that she claims by deed, and for that reason mere nonuser would be of no avail to impair or defeat her right. The nonuser, to have that effect, must be in consequence of something which is adverse to the user. Nothing short of adverse use, on the part of the owner of the servient estate, inconsistent with and preventing the use of the easement, can destroy the easement. According to the authorities, the interruption of the easement, by adverse use on the part of some person adversely interested, must be continued for at least twenty years in order to destroy the easement. *Smyles* v. *Hastings*, 22 N. Y. 217. *Arnold* v. *Stevens*, 24 Pick. 106. Washburn on Easements, 551, 556, and cases there collected. In this case there has been no inconsistent or adverse use by the defendant and those from whom he derives his title ; and the very title deed under which he holds the Hull lot, in express terms, reserves and excepts out of the grant the rights of Burrall, in the springs, as reserved in the deed from Burrall to Hull.

The defendant also insists that the plaintiff's right in the springs is subject to the conditions described in the Kellogg indenture. In the deed from Burrall to Hull, the grantor reserved to himself and his heirs, &c., in very general and comprehensive terms, the entire control of the water of the springs. It is true that in so doing he uses the expression " as per the conditions relating to the present pipe and fixtures." But, at the date of that deed, neither of the parties to it had any interest in, or were under any obligation towards, the owner of the homestead which has since been conveyed to the defendant or his family. Woodbridge had conveyed it to Hyde, and Hyde had no rights in the springs except such as were reserved to Woodbridge under that indenture. Upon the termination of the easement created by that indenture, the lessees under it had the right to remove all

Owen *v.* Field.

their fixtures, the indenture was "to cease and be thereafter void and of no effect," and the right in the springs then stood exactly as if no such indenture had ever been made. They came under the full control of Burrall, according to the reservation in his deed. He was under no obligation or necessity to impose upon their use any condition for the benefit of a mere stranger to the title, and we can give no other construction to the phrase "as per the conditions relating to the present pipe and fixtures," than to say that it was descriptive of the mode of use, and the general manner of conducting away the water, doing no unnecessary damage, &c. It certainly cannot operate as a grant to a third person.

Whatever rights the plaintiff can lawfully claim in the four springs, she holds by a single and indivisible title, not dependent on continuous user, but upon a series of formal and regular grants from successive owners. It can hardly be said, merely because her predecessor had never exercised the whole of his right, and she also had not done so until quite recently, that her title had not been put in use, and that therefore her remedy in equity must be confined to the two springs first connected with the aqueduct. It is enough that she has made out a case of long continued enjoyment under a clear title; that, although she has not used her whole right, she has never abandoned any part of it; and that the defendant's denial of her right and his opposition to its exercise have extended to her whole title.

We did not intend, in this additional hearing, to reopen the controversy between the parties, or to intimate any uncertainty in our own minds as to the general character of the decision already given. On the contrary, we have desired to confine ourselves strictly to the objections taken by the defendant to the decree originally prepared. And as to those objections, we do not see on what ground they can be sustained.

*Final decree for the plaintiff.*