THE BOARD OF SUPERVISORS OF THE COUNTY OF KENT v. THE CITY OF GRAND RAPIDS, GEORGE E. PANTLIND, ET AL. [TWO CASES.]

*Equity—Bill to declare right of county to parcel of land once used for county-seat purposes— Where controlled by city in which situated, under claim of right in the city, for thirty years, bill was dismissed—Dedication of land for county-seat purposes—Removal of county-seat therefrom, and sale of court-house to owner of fee, divest county of all claim to the land —Title of county under dedication not beneficial except for county purposes—Fee ancillary to the trust created—If land conveyed by unlimited grant, adverse possession for thirty years by city renders application of county for equitable relief rather late.*

1. Where a city has had peaceable control for over thirty years of a parcel of land once claimed by a county for county-seat purposes, such con-

trol being under claim of *right* in the city, and not simply to give police protection to said land as public grounds, a bill in equity by the county to declare its right to the land under its original claim is filed too late, and will be dismissed.

2. A parcel of land was dedicated to a county for county-seat purposes, a court-house erected thereon and used for some years by the county, when the county-seat was removed from the land, and the county sold the court-house to the owner of the fee, abandoning all control of the site.

*Held,* that the title in the county under the dedication was not beneficial, except so far as the purposes were *county* purposes; that the fee was ancillary to the trust, and could give no further proprietary right.

*Held,* further, that on the removal of the county-seat from the land, and the recognition of such removal by the county by the sale of its court-house to the owner of the fee, it lost all interest in the land, and ceased to have any proprietary rights under the dedication.

*Held,* further, that had the land been conveyed to the county by unlimited grant, it would have remained county property until in some way transferred, but that even in such a case, after nearly thirty years' adverse possession and claim (see head-note 1), it would be rather late for the county to ask for equitable relief.

Appeal from Kent. (Montgomery, J.) Argued April 19, 1886. Decided April 29, 1886.

Bill filed to determine complainant's right to an alleged court-house square. Defendants appeal. Decrees reversed and bills dismissed. The facts are stated in the opinions.

[The importance of these cases and of the principles involved seems to call for full extracts from the briefs of counsel, which are given below.—REPORTER.]

*Isaac M. Turner* and *M. J. Smiley*, for complainant:

1. A bill in equity is the proper remedy in this case.

*a*—Because the complainant was in actual possession at the time of beginning the suit, and might maintain such a bill to quiet its title and establish its equitable right in the property, under How. Stat. § 6626.[1]

*b*—But independent of the statute the present bill may be maintained. All equitable remedies relating to the title to

---

[1] See note, page 173.

land, existing before the statute, are still in force and avail-able independently of it, and irrespective of the question of possession : *Ormsby v. Barr*, 22 Mich. 85.

Although the bill contains the requisite allegations for a bill to quiet title, the suit is really one to establish the com-plainant's right to use the land for public purposes, and the question of possession is unimportant: *Jones v. Smith*, 22 Mich. 365 ; *Village of Mankato v. Willard*, 13 Minn. 28.

Where a party has an equitable cause of action against another, coming within any recognized rule of equitable jur-isdiction, such right can be enforced in equity whether com-plainant is in possession or not. No statute was needed to enable any one to sue in equity upon an equitable cause of action, and in such case possession is not important, and has never been required: *King v. Carpenter*, 37 Mich. 366 ; *Geney v. Maynard*, 44 Id. 580.

According to the complainant's theory, an action of eject-ment could not be maintained, because it alleges and claims that it is already in possession, and that whatever seeming or actual possession the city has, or has had, was not adverse, but consistent with the right claimed in the bill by the complain-ant. See *Mankato v. Willard*, 13 Minn. 28.

The ownership of the fee by the defendants is not incon-sistent with the right claimed by the complainant, and is not in dispute, nor is the right of possession, except for the pur-poses of the public claimed in the bill.

The necessity of a resort to equity arises from the nature of the controversy. It is claimed in the bill that the land in con-troversy has been dedicated to a public use according to the rules of the common law ; and in such case it is well settled that the fee does not pass, but the right to use for the public purpose does. See Washb. Eas. & Ser. p. 155.

Both parties claim to be in possession, which claims arise from a public use of the property. The complainant claims that the said use is consistent with its rights, and the defend-ants claim it is inconsistent. The complainant desires to appropriate the property to the particular public use intended by the dedication, by erecting extensive and costly buildings upon it for the use of the county, and it cannot safely proceed to do this while the defendants make claim to the property inconsistent with this right. As has been stated, ejectment will not lie, and equity seems to be the proper jurisdiction in which to have the complainant's rights ascertained, settled, and decreed. The alleged dedication occurred many years ago, and the complainant will soon be without witnesses to

prove the facts necessary to sustain it. *Morgan v. R. R. Co.,* 96 U. S. 716; *Beatty v. Kurtz,* 2 Peters, 566; *Trustees, etc., v. Cowen,* 4 Paige, 510; *Commonwealth v. Rush,* 14 Penn. St. 186; *Hayes v. Livingston,* 34 Mich. 395.

2. The property in question was dedicated for court-house purposes. All that is required to make a valid dedication is an offer on the part of the owner of the land, and an acceptance of it on the part of the public: *Morgan v. R. R. Co.,* 99 U. S. 716.

Whether the owner intends to make a dedication must be determined from his acts. All that is required is the *assent* of the owner, and the *use* of the premises for the purposes intended by the appropriation: *Morgan v. R. R. Co.,* 96 U. S. 723; and dedication may be of a park or public square as well as of a street: *Baker v. Johnston,* 21 Mich. 319; *Cincinnati v. White's Lessee,* 6 Peters, 431; *White v. Smith,* 37 Mich. 291.

The ancient plats in use in the public offices, although insufficient to show a statutory dedication, are proper evidence, and tend to show a common-law dedication: *Commonwealth v. Alburger,* 1 Wharton (Penn.) 469; Washb. Eas. & Serv. 203; *Barclay v. Howell's Lessee,* 6 Pet. 498.

3. Mere non-user is not an abandonment, and after acceptance by the public something more is required to extinguish the public right: *Ward v. Ward,* 7 Exch. 838.

In the case of a *public way* or right, no length of time during which it may not have been used will operate of itself to prevent the public from resuming the right if they think proper: 2 Greenl. Ev. § 665; nor are private easements lost by non-user for twenty years, unless the right as well as the possession is interrupted: Id.

Mere suspension of the exercise of a right is not sufficient to prove an intention to abandon it, and even where the suspense is long continued, it is not an abandonment where the party indicates during the period his intention of preserving it: Washb. Eas. & Serv. p. 544; but there must be abandonment and non-user of such a character and duration as to show an intent to abandon the easement: Washb. Eas. & Serv. p. 551.

4. In cases of dedication, the owner retains the right to use the land in any way compatible with the full enjoyment of the public easement: *Abbott v. Mills,* 3 Vt. 521; *State v. Catlin,* Id. 530.

In *Carter v. Portland,* 4 Oregon, 348, it is said: "As regards the improvement and use of public parks or squares,

it is sufficient if they are put to the use to which they are dedicated *when* the public convenience requires. The dedication having been made, etc., we are not sure it could have been lost by non-user for twenty years, except so far as it was ousted by an adverse use for that period. To say that a dedication made when the site of the town is new would be lost if not followed by immediate or continued use, would deprive the dedication of its intended value.

" The local authorities or the corporate guardians are the ones whose duty it is to improve, adorn, and embellish the property, and they are the judges when the public pleasure demands the use of the lands dedicated. The original owner, though he has the naked fee, has no right whatever to interfere with the premises, except where the use becomes impossible, or where the authorities seek to put the premises to some other use than that to which they were originally dedicated; then he, as well as other lot-holders, may proceed in equity to enforce the use according to the original dedication."

See, also, *Hardy v. Memphis*, 10 Heisk. 127, where it was held that misappropriation of the land to purposes not contemplated by a dedication does not work an abandonment or forfeiture, but only entitles the proprietors to file a bill to enjoin the improper use. On page 136 it is said : " In some cases an abandonment of an easement may be presumed or inferred from non-user, but rarely, if ever, unless there has been such a use by the owner of the premises in or over which the easement has been enjoyed as to indicate a claim of right which is adverse to the enjoyment of the easement."

In *Rowan's Exs. v. Portland*, 8 B. Monroe, 232, it is held that public ground being dedicated in a town to public use, the right is not lost for want of use, but exists to be used as the public convenience may require; also, that the use by the town and the general public is sufficient to preserve the pre-existing right from any presumption of abandonment, or of ouster and loss, by mere constructive possession or claim against it. See, also, 2 Smith's Leading Cases, 222, notes to *Dovaston v. Payne*.

In *Barclay v. Howell's Lessee*, 6 Peters, 507, it is held : " That if ground be dedicated for a particular purpose, and the city authorities appropriate it to an entirely different purpose, it might afford ground for the interference of a court of equity to compel a specific execution of the trust, by restraining the corporation, or by causing a removal of the obstructions; but even in such a case the property dedicated

would not revert to the original owner. · The use would still remain in the public, limited only by the conditions of the grant."

If buildings are erected on the space dedicated, or grants of part thereof are made by the one who originally made the dedication, the vested rights of the public are not thereby affected : *New Orleans v. U. S.*, 10 Pet. .662.

The city charter has always contained provisions similar to the present one, viz.: "That the common council shall have the care and supervision of the highways, streets, lands, alleys, parks, and public grounds in said city, and it shall be their duty to give directions for the repairing, preserving, improving, cleaning, and securing of such highways, * * parks, and public grounds, and to cause the same to be improved," etc. (title 3, secs. 35, 43; title 6. sec. 1); and it is under supposed authority arising from similar provisions that the city has assumed to improve these public grounds, and not under the claim of ownership.

The city, in September, 1850, fully acknowledged the occupancy and right of the county, and offered to quitclaim to the commissioners appointed to locate a county-seat for Kent county, all its right to "the court-house square, and now occupied by said county."

October 6, 1856, the city offered all of its right to the county, for the purpose of locating the court-house thereon; and it cannot be fairly urged that the action of the city in taking care of the land and keeping it open for a public park has extinguished the public right.

*J. W. Ransom*, for City of Grand Rapids:

The bills filed are bills to quiet title, and complainant cannot have the relief asked for, because the county, as appears by the record, is not in the *actual* and *exclusive* possession of the premises as averred in the bill, and not in *actual* possession as required by law: How. Stat. § 6626. (See note, page 173.—REPORTER.)

The statute authorizes bills of this character only in cases where complainant is in the actual possession of the premises, and can be sustained only on the ground that complainant has no other means of bringing his title into adjudication.

The record shows that complainant claims that it has the right to possess this square for the purposes of a county-seat, and to erect county buildings thereon, and this claim can be adjudicated in an action of ejectment; for ejectment is a

possessory action simply, and we insist that the nature of the claim of right to possession for the purposes indicated, as disclosed by the testimony, can be shown at law as well as in equity, in an action of ejectment. If the possession sought were a partial possession, or if it were a possession jointly with the defendant city, the remedy at law might be inadequate; but the possession sought is absolute, exclusive, and unlimited, and because it is to be devoted to a particular use makes it none the less absolute and exclusive. Therefore we insist the remedy at law is perfect. *Devaux v. Detroit,* Harr. Ch. 98; *Blackwood v. Van Vleet,* 11 Mich. 255; *Moran v. Palmer,* 13 Id. 368–78; *Tabor v. Cook,* 15 Id. 324; *Woods v. Monroe,* 17 Id. 238–245; *King v. Carpenter,* 37 Id. 366; *M. E. Church v. Clark,* 41 Id. 738.

The only possession which complainant has had, for over thirty years, was for a few days while its counsel was preparing and filing these bills. At that time it caused a tight board fence to be built around it, for no other purpose than to afford a foundation for the bills; and this was promptly removed as soon as it came to the notice of the city authorities.

This action on the part of complainant was a trespass upon the defendant city's possession. It was a possession, if it may be called such, which was unfairly gained, for no other purpose than to support these bills, and is unavailing for that purpose: *Stetson v. Cook,* 39 Mich. 754.

We submit that the bills in these cases should be dismissed, so far as the defendant city is concerned, with costs, because:

1. The county (through its board of supervisors), after its right to occupy the square had been brought into dispute, having elected to end the controversy by a surrender and abandonment of the same in 1850, and having surrendered and abandoned the same finally at that time, and the city having entered into the possession and control of the same, and fitted the same up as a public park, for general public uses as such, and expended moneys thereon in beautifying it and making it attractive to the public as a public resort, and having possessed, managed, and controlled the same for more than thirty years,—complainant is now estopped from resuming possession thereof.

2. The defendant city has been in the open, peaceable, quiet, and uninterrupted possession of the premises, adverse to complainant, for over thirty years, and therefore has a prescriptive title thereto, and the right of possession thereof, for the uses and purposes of a public park, against complainant and all others.

3. The defendant city has been in possession of the north half of the premises in question for over thirty years by grant from Louis Campau, the original proprietor thereof, received from said Campau while he was in the actual possession thereof; and is entitled to hold the same under said grant, as well as by a dedication thereof, or an offer of dedication, for general public uses by said Campau, if the same was effectual for any public use.

4. Complainant has shown no title to the premises, legal or equitable.

5. It is not shown that any portion of said square was ever dedicated to the uses of complainant, or to the county of Kent, and the dedication, or offer of dedication, if effectual, was for general public uses.

6. There is no evidence that the county seat of the county of Kent was ever located on the premises in question by any lawful authority.

7. The evidence shows without contradiction that the county seat of the county was located elsewhere than on the premises in question by competent authority, viz., on land owned by George Kendall, at the southeast corner of Fountain and Barclay streets, in Grand Rapids, in 1850; and it was also located on the west side of Grand river, in 1851, by the act and vote of the board of supervisors.

*John E. More,* for defendant Pantlind:

The right to the enjoyment of an easement, whether public or private, may be lost by abandonment. To constitute an abandonment that will destroy the right, there must be an intent to abandon on the part of the owner of the easement. The abandonment may be either active or passive. It is passive when the intent is evidenced only by non-user; it is active when the ceasing to use the easement is accompanied or followed by acts which clearly and unequivocally show an intent to abandon it.

A passive abandonment for less than twenty years would probably not destroy the right, while an active abandonment for a year might effectually cut it off.

In the case at bar, the county ceased to use the easement it now claims at least as early as 1852, and has never resumed the use of it. The non-user continued for a period of over twenty-nine years prior to the filing of the bill, and were there no further evidence of an intent to abandon, the right would be destroyed.

Any other rule would be unjust and inequitable. The dedication of the south half of the square, if made, was made for a specific public use, viz, for a court-house.

It cannot be presumed that the motives of the proprietors in offering the land were wholly unselfish. They owned a considerable tract of what was then suburban land adjoining the square, the value of which would be enhanced if the offer were accepted and the purpose carried out. It was not an absolute gift, but an offer to convey upon consideration of the performance of the condition attached. The offer implies that the proprietors had an interest in the accomplishment of the intended purpose. The purpose of the offer could not be accomplished by an acceptance and temporary use, but only by the continued and permanent use of the land for a court-house.

Has the county performed the condition of the offer, or paid the consideration for the land ?

True, it accepted the offer and built the court-house, but before any of the expected benefits and advantages which moved the proprietors to make the offer had been realized, and while their adjacent lands were still unoccupied and unimproved, the county abandoned the site, and has never since occupied it. Being so long in default, what right has the county to equitable relief ?

It will be remembered that the weight of evidence indicates that the court-house stood on the north half of the square, and that the south half was wholly unoccupied, and that immediately after the county ceased to use the square, Campau, the proprietor of the north half, took possession of it, and held it until he sold it to the city, in 1852, since which time the city has claimed to hold it adversely to the county.

Non-user so long continued, accompanied by the resumption of possession by the original proprietor, defeats the right to the easement.

It has been determined by this Court that if the public fails to accept a dedication within a reasonable time, the right is lost, and the land reverts : *Sinclair v. Comstock*, Har. Ch. 412–13 ; *Cass Co. v. Banks*, 44 Mich. 476 ; and the same rule should apply to an intentional abandonment.

CAMPBELL, C. J.   These cases relate to the claim of the county of Kent to what was originally known as the court-house square in Grand Rapids, and the bills were filed to quiet its title against the city of Grand Rapids as setting up

ownership in one-half by title absolute, and in the other as possessed by dedication, and against various persons setting up title to the south half as never lawfully dedicated to any use. In brief, the claim of the county is claimed to have arisen out of a location of the county-seat, by the territorial authority, on this square, by desire or acquiescence of the first proprietor, and its subsequent recognition by his grantees, who platted and sold lands recognizing the public purposes of the square.

The north half is claimed by the city as grantee of Louis Campau, who owned the platted lands, and after the county had, as the city insists, relinquished such rights as it may have had, sold the property to the city. The south half is claimed by the city by dedication to public uses, and against both city and county is claimed under the original holders as not dedicated, or, if dedicated, relinquished.

The relinquishment is claimed to have been made out by an official removal of the county-seat from the square, and acquiescence in it.

In the view we take of the case, no good purpose would be served by a minute consideration of the circumstances of the original dedication. The facts are clearly shown that, instead of a general location of a county-seat in a town, village, or other public subdivision, the square in question was chosen by territorial authority, and so treated by the landowner and his successors in the title, whose interests were no doubt promoted by it. The land was built upon and actually and openly used for the seat of justice for many years, and, so far as the original land-owners and their successors were concerned, it would no doubt have been perpetually continued so without opposition had there been no disturbance from other sources.

For reasons which apparently sprang from local jealousy and contention, action was obtained from the Legislature, in 1850, whereby commissioners were again appointed by the State to establish the seat of justice of the county. This they did upon another parcel of land owned by Mr. Kendall, and the governor made proclamation accordingly. In Octo-

ber, 1850, after that designation, the supervisors took some
steps to have the new ground which Mr. Kendall had deeded
prepared, but seem to have had some idea that they were
not yet shut out from all control of their own choice of
places, and accompanied this action with a saving clause
against any obligation to build on it.

During the succeeding session of the Legislature, in 1851,
when means of communication seem to have been imperfect,
the board of supervisors supposed they had prevailed on the
Legislature to remove the county seat to still another place
offered to be given by George Coggeshall, and took action,
depending on the fate of that measure, which came to noth-
ing.   A strife arose between east and west side, and a good
deal of disputing and counteraction went on.   But no one
supposed the county-seat had not been removed from the
square now in controversy.   In June, 1851, a motion was
made to *remove* the site or location for the county buildings
" to the lands proposed to be deeded to the county of Kent by
Louis Campau, and which is known as the north half of the
court-house or public square, upon which the present court-
house stands."   This was lost, but not from any apparent
doubt in regard to the necessity of some restoring action if
they desired to keep it.   In October, 1851, a resolution was
adopted accepting a conveyance from George Coggeshall,
and locating the site for county buildings on the west side of
Grand river, as had before been done in contemplation of
getting suitable arrangements with Mr. Coggeshall and Mr.
Turner.

In January, 1852, further resolutions were passed to re-
move doubts concerning the effect of the various removals
on the titles of lands before devoted to county purposes.
The first of these resolutions declared that the new removal
had vacated the former removal to the Kendall lot, and
directed a quitclaim and reconveyance to Mr. Kendall.   The
second directed a sale of the old court-house on the square
now in controversy.   This was sold to Louis Campau, who
owned the fee, and this sale was approved, and the money
appropriated to expenses of the new jail.

In the latter part of the same year, 1852, Mr. Campau conveyed to the city the north half of the square for $500, with the right to remove the old court-house. The city had already claimed it as a public ground, dedicated to such uses as gave them control of it, and this settlement was the result of an arbitration. At this time, or earlier, the whole square was taken possession of by the city as public ground. From that time to this the city has claimed, improved, and possessed it, although at one time a claim for public assessments seems to have been made against the county. We have not deemed it necessary to examine into this transaction for reasons which will appear hereafter.

On several occasions since 1852, the supervisors have taken action at their meetings upon the question of their rights over this square. The reports made have usually been adverse to such rights. But no measures have ever been taken to put back the county-seat there, and these suits are the first legal measures begun to reclaim the property, although in 1881 an attempt was made to recover it by assuming possession and fencing it, which was at once resisted, and the fence taken down by the city. These suits were then brought.

In our opinion, there are two fatal objections to the present proceedings. One is that the city has had peaceable control for over 30 years, and when the bill was filed had been in possession nearly that time. It is no doubt true that such control might be entirely consistent with keeping it for the county, or any other lawful public use, as the city is placed in a position to give police protection to any public grounds not otherwise guarded. But in this case the custody has been under claim of right in the city itself. This would be adverse to the county right, and the bill is filed too late.

The other objection is equally fundamental. Assuming, what we need not pass upon, that there was once such a dedication as made the county statutory trustee for the public uses declared by the platting, that title in the county was not beneficial, except so far as the purposes were county purposes, and the fee was merely ancillary to the trust, and

could give no proprietary right further. When the county-seat was legally removed from this land, it is difficult to see what right the county had to occupy it any longer for a seat of justice. When the county recognized this removal, and sold its building to the owner of the fee, it lost its last interest in land or building. Once lost, it could not be reclaimed without something equivalent to a new grant, and a right to have its county-seat put back. Neither of these conditions has ever existed.

In our opinion, the county, when the county-seat was removed, ceased to have any proprietary rights under the dedication. Had the land been conveyed by grant, it would have remained until in some way transferred, unless the grant itself was limited. But even in such a case, after nearly 30 years' adverse possession and claim by the city, it would be rather late to ask aid from equity.

In the present suits we are not called on to settle the conflicting pretensions of the defendants. We have therefore avoided discussing their claims of title after the removal of the county-seat, which occurred so many years ago.

The bills must be dismissed, with costs of both courts.

SHERWOOD, J., concurred. CHAMPLIN, J., did not sit.

MORSE, J. (*dissenting*). The proofs in these two cases were taken by stipulation as in one case, and were argued together here. The bills of complaint were filed to quiet the title to a piece of land in the city of Grand Rapids which has been known as and called, by the public generally, the "Court-house Square" or "Public Square" in said city, and latterly by many as the "Public Park."

Owing to the destruction of the records of conveyances in the office of the register of deeds of Kent county by fire some 15 years ago, it has been somewhat difficult to show the whole record history of the land in controversy, but yet we are enabled to get a pretty clear statement, from the record before us, of its ownership and use, from the date of its first transfer by the government to the present time.

December 2, 1833, 80 acres of land, of which this parcel in question was a part, was patented by the United States to Samuel Dexter, of Ionia.    While he claimed the title, and it was supposed he owned it, but before the patent was issued, in November, 1833, James Kingsley, S. V. R. Trowbridge, and Charles Lanman, commissioners appointed by the governor of the then territory of Michigan to locate the "seat of justice" for the county of Kent, came to the city of Grand Rapids, and located the same upon the lands of Samuel Dexter, as reported by them, and marked a hickory tree thereon as the center of the same,—the said piece of land to be 20 rods square; and from the proofs it appears that said piece of ground, so located and marked, covered substantially, as near as may be, this so-called "Court-house Square."

Samuel Dexter recognized this "seat of justice" in his subsequent conveyance to Daniels and Sheldon, and this location may be said to have been the foundation of this land being dedicated and reserved for public use.

In April, 1835, Dexter and wife conveyed a portion of his land to Louis Campau, including the north half of this courthouse square.    This is the parcel of land in controversy in the first-named case, which the city of Grand Rapids claims to own under a deed from said Louis Campau dated August 12, 1852, quitclaiming the said premises to said city, "to be and remain public grounds for the free and uninterrupted use of the inhabitants of said city, and for no other purpose."

In August, 1835, said Dexter and wife deeded to Lyman I. Daniels and Thomas C. Sheldon another parcel of his lands, including the south half of said square, and bounded on the north by a line, due east and west, "passing at a tree marked by the commissioners to locate the seat of justice of Kent county as such location."

This south half of the square is the land involved in the second case.    The city of Grand Rapids claims it by adverse possession for more than 20 years, for the purpose of maintaining and preserving a public park thereon for the use and benefit of its citizens.

The defendant George E. Pantlind claims title by conveyances from the heirs of Daniels. The defendants Thomas P. Sheldon, Alexandrine W. Willis, and Rosa C. Geiss are the heirs at law of Sheldon, and claim an interest as such heirs in the premises.

The square, as now situated, and embracing these two parcels of land, is bounded on the north by Park street; east, by East Park place; west, by West Park place; and south, by Fulton street.

The county of Kent claims the whole of the square by dedication of the same for court-house purposes by the proprietors of the land, and acceptance of the same upon the part of the said county.

It is very evident that the proprietors of this land, in platting it for village purposes, dedicated this land to the public for public uses, and there is but little, if any, doubt but the dedication was intended for county purposes; that is, for use for the building and maintaining of a court-house and other county buildings thereon.

Louis Campau, in platting his property, the plat being recorded in Kalamazoo county, June 6, 1835, and in Kent county in 1843, marked this north half upon the plat as "public square;" and intended, in so doing, to offer it to the public for court-house purposes. This is shown clearly enough by his statements and subsequent acts.

Somebody also platted the lands owned by Daniels and Sheldon, which plat was known as Bostwick & Co.'s addition to Grand Rapids. This plat was made about the year 1838, and had the south half of this square marked upon it and reserved as "court-house square." This plat was made by one E. B. Bostwick, who, it is claimed by the complainant, was acting as the agent of Sheldon, Daniels, and one Tileston, who had purchased a one-fourth interest in their property. It is not very certain from the proofs, such a length of time having elapsed and affecting the memory of the witnesses, just in what capacity Bostwick was acting when he made this plat; but one thing is certain, that nearly all the conveyances

of land in that vicinity, and covered by the plat, were thereafter made in accordance and with reference to said plat.

It is very plain to me that this plat was authorized by the proprietors of the land, and that by said plat they intended to and did offer the land so marked to the public for use as a court-house square ; and for nearly fifty years, while Grand Rapids has been growing in population from a village of a few hundred people to a.city of 50,000 or more inhabitants, and while this piece of land has been growing, year after year, more and more valuable, it has nevertheless always laid out open to the public, and been unmolested in its public use by any private person or persons, except a feeble attempt on the part of Louis Campau to retake possession of the north half, which will be mentioned hereafter.

It was certainly dedicated as solemnly as possible to the public for some public use, and it has been accepted and used by the public continuously ever since, without the interference of any private rights or claims to impair or impede such use.

This alone, in my opinion, disposes of all claim of title to this square, or any part thereof, by any private individual or individuals. It is either the property of the county or of the city for public purposes.

Another and most convincing fact showing that the whole of this square was dedicated to the public for court-house purposes is the building of a court-house upon the same in 1838, and its maintenance there until 1844, when it burned. The proofs show that this building was located as near the center of this square as possible, and occupied a portion of both halves of the same. Courts were held there, and the sheriff resided in the building. Campau was then a resident of the city, and he and the other proprietors knew of such occupancy, and never demurred or protested against it.

When this building burned, a temporary structure was erected in its stead, and occupied by the county for the holding of courts until some time in 1851 or 1852. During this period of fourteen years the possession and occupancy of the county were undisturbed by any other person or persons.

Here, then, was a substantial dedication of the premises to the county of Kent for court-house purposes, and an active and sufficient acceptance of the same. If the county has not lost the right to hold these premises for such purposes, it needs no reference to authorities to sustain its present claim.

It is argued by the counsel for the city that in 1852 the county, through its supervisors, formally abandoned the whole of the square; gave up, in fact, its possession and control of the same; sold the court-house building to Campau; and has never since had possession, occupancy, care, or control over the land until just before the filing of the bills of complaint in these cases, when it took a possession of a few days, by building a fence around the square, for the purpose of laying a foundation for these suits.

I am unable to find any evidence of any formal abandonment by the county of its right to the use of this property for court-house purposes, or any definite intention to abandon it, save that which may be implied from so long a non-user of the premises.

There has been more or less quarreling among the members of the board of supervisors as to the location of a court-house. The strife among those in favor of different localities has, as usual in such bodies, been quite warm, and extended over a number of years, with various resolutions passed and lost, reconsidered, passed, and lost again. Yet with all the discussion had, and action taken, no court-house has ever been built, or commenced to be built, upon any other spot, or any other place, definitely located for such building; and during most of the years something has been done looking towards the holding of the ground in controversy, and for the purposes intended by the dedication and acceptance in the first place.

The action of the board of supervisors in relation to this square may be summarized as follows:

From 1838 to 1851 courts were held uniformly in buildings erected upon the land for that purpose; the first lease taken of any place to hold courts, outside this square, commencing to run January 1, 1852.

Nothing appears of record touching the court-house square in the proceeding of the supervisors until the October session of 1856, when counsel were consulted and heard as to the validity of the title of the county to the same, who declared it to be good.

In 1850, through the instrumentality of citizens of the northern half of the county, the Legislature passed an act (S. Laws 1850, 289, 290) appointing three commissioners "to examine the present location of the county-seat of the county of Kent," and "to proceed and ascertain whether, in their judgment, it is now located at such place as will most promote the interests of said county;" and if such commissioners should find it was not so located as to promote such interests, it was made their further duty "to establish said county-seat at such place as they, or a majority of them, shall consider for the best interests of said county, upon such land as shall be deeded to the county for that purpose."

The commissioners appointed by virtue of and under this act located said county-seat, in a report dated October 5, 1850, upon a piece of land in the city of Grand Rapids, upon the east side of Grand river, owned by George Kendall, and Kendall executed a deed of the same to the county of Kent, which deed was delivered by said Kendall or the commissioners to the treasurer of said county for record, as appears by said report.

Thereupon, on the fourteenth day of October, 1850, Gov. John S. Barry issued a proclamation reciting said commissioners' report and the recording of said report in the secretary of state's office, as provided by said act, and declaring said location the lawfully established county-seat for said county of Kent.

I cannot find that this piece of ground so located was ever accepted by the county. It is claimed that this location shows an abandonment of the court-house square as the county-seat. I do not think so.

October 22, 1850, a few days after the proclamation of the governor, the supervisors gave their consent that George

61 Mich.—11

Kendall and others might grade this lot, but, in the resolution granting such consent, expressly stipulated that nothing in such resolution "should be construed to obligate said board of supervisors to occupy the same for a county site." Nothing was ever done, in any way, outside of the granting of this consent to grade, in recognition of this site; and January 13, 1852, the chairman and clerk of the board were authorized to reconvey the premises to said Kendall, which they did. The land has therefore passed out of the possession and ownership of the county, and for over thirty years been in the hands of private parties. It cannot be and is not seriously contended here that such act of the Legislature, or the location of the commissioners appointed under such act, is now binding upon the county of Kent, or has been binding since the acceptance back by Kendall of the deed of the premises. When the supervisors refused, in substance, by their resolution of October 22, 1850, to recognize or accept said site, they were in the possession, control, and occupancy of the court-house square, and held the courts thereon until January 1, 1852. It is difficult to perceive what bearing the acts and doings of these commissioners have upon the question of the abandonment of the court-house square by the county, except it be to strengthen the impression, considering these acts with the proceedings of the supervisors in relation thereto, that the county authorities meant to retain their right to the use of this square for court-house purposes.

It is also urged that about this time the county-seat was established on the west side of Grand river, in the city of Grand Rapids, and that by such location the court-house square was practically abandoned.

In October, 1851, a resolution to locate the "county site" on the west side of the river, "on lands formerly offered by Geo. Coggeshall," was offered and voted down by the supervisors; but in the same month it was resolved to locate the "county buildings" upon the same premises, and a committee appointed and money appropriated to build a jail upon said site.

In view of the fact that the supervisors refused to locate the "county site" there, and never built a court-house upon the land, but voted to locate the county buildings thereon, and built a jail only in connection with such vote, renders it extremely doubtful if there ever was an intention to locate the court-house there. No county buildings were erected on this west-side land, and it was occupied only for jail purposes and sheriff's residence.

In 1854 a struggle began, in the interest of the people upon the east side of the river, to get the location of the county buildings back on that side, which conflict lasted from that time until 1860 or 1861, occupying more or less of the attention of the supervisors at every session of the board.

In February, 1857, certain citizens offered to donate a sum of money, and the free use of Luce's Hall for court purposes for five years, if the supervisors would locate the court-house and other county buildings on the court-house square. A resolution to accept such donation and locate accordingly, after discussion, and hearing of counsel *pro* and *con* upon the question of the title of the county to the square, was lost by a vote of twelve yeas to thirteen nays. At the same session a resolution to raise $3,000 to be expended in building fire-proof county offices upon the site on the west side was voted down. The next day after this vote, a resolution was passed locating the site for the court-house and county buildings upon some lots upon the east side of the river, provided certain conditions were complied with by citizens of the county. Whether such conditions were ever complied with does not appear, but we hear nothing further about such location.

No further proceedings appear in the records of the board of supervisors in relation to the location of a court-house or county buildings until 1860, court being held and county offices located in the meantime in rented rooms at various places.

January 13 of that year the title of the county to the court-house square was again brought before the supervisors.

A resolution to locate the county offices on the west side was lost. A resolution locating the county offices on the court-house square, provided the city would deed to the county its claim to the same and the county should be indemnified for any damage arising from changing the location of said offices, was passed by a vote of nineteen yeas to eight nays.

February 17, 1860, this was rescinded, " in order to bring the whole subject now under consideration before the board." The next day the board resolved to submit to a vote of the people two propositions : one to locate the court-house and county buildings upon the court-house square, and the other to locate the same on the property on the west side of the river. On the same day a resolution was adopted to build fire-proof county offices upon the Carroll lots, 61 and 66 of the Kent plat of the city of Grand Rapids, where they were built, and where the present county offices of Kent county are situated. The buildings rented for county offices before this were burned January 23, 1860, destroying many records.

It is claimed that building these fire-proof offices upon these Carroll lots evinced a disposition upon the part of the county to locate the county-seat there ultimately, but the proofs show, as stated above, that, when it was voted to build them, the ultimate location of the court-house and county buildings was submitted to the people. It also appears that a deed of the premises was rejected by the supervisors because of the insertion of a clause therein that "the conveyance was for the purpose of erecting on said lots county offices." The county required and finally obtained a deed conveying the absolute title in fee of the land.

The erection of these buildings was evidently of a temporary character, and for temporary purposes only, to avoid future dangers from fire, until such time as a permanent structure would be voted by the people, and June 12, 1871, a canvass of the votes cast at the spring election of that year showed a majority of three to one against a proposition to raise $5,000 to add another story to these buildings for court purposes.

The two propositions submitted to the voters of the county

in the spring of 1860 decided nothing, as the votes were never canvassed or the result declared. The votes were canvassed as far as returned, but no returns being received from the townships of Algoma, Cannon, and Gaines, and the Second ward of the city of Grand Rapids, the result was never officially declared, nor any action taken by the supervisors thereon, except as hereinafter stated. Resolutions were offered in April, 1860 to accept the lot upon the west side, and defeated. Thereupon the owner of the premises upon that side withdrew his offer of the land, and, after considerable negotiations, the county paid him ground rent from 1851 up to 1862, and abandoned the further use of the premises for any purpose.

I do not apprehend that the use of this west-side land for jail purposes for 10 years or more, under the circumstances and proceedings heretofore set forth, can be construed or looked upon as a formal abandonment, during such period, by the county, of the court-house square for the purpose of a court-house. During nearly all this time there was a steady conflict going on as to the location of the court-house, with no definite result, except to prevent the erection of any county buildings anywhere, until the loss of the county records necessitated and brought about the temporary location and·building of fire-proof county offices where they now stand, on the corner of Kent and Lyon streets.

Neither does the building and maintenance of the present jail building on property other than the court-house square cut any figure in the case. The old jail building on the west side being unfit to remove or use elsewhere, upon the abandonment of the lot upon the west side another lot was purchased and a jail erected, the people voting the funds for the same, without any reference whatever to the question of the location of the court-house and other county buildings.

After this vote in 1860, and the final ending of the claims of the west side to the county-seat, nothing further appears in the proceedings of the supervisors in relation to the site of the court-house until January 11, 1866, when a committee of the board, in a report upon the location of a jail, recom-

mended also the building of a court-house upon the court-house square. A resolution was thereupon adopted, locating said court-house as recommended, yeas 23, nays 4. It was also voted to submit propositions to the people to raise $15,000 for jail and $40,000 for court-house. This proposition to raise money for the court-house, if submitted, must have been defeated by the people. It it not clear from the record that it was ever submitted.

In October, 1866, an account was presented to the supervisors for the grading and paving of Fulton street, south side of the public square, and being advised by the prosecuting attorney that the county had rights in said square, the same was ordered paid by a vote of the board.

From 1866 up to 1881 various acts upon the part of the supervisors were done in recognition of the location, in 1866, of the court-house upon the square, and nothing evincing any contemplated change in such location, excepting the proposition, submitted to the people in 1871, to raise the county offices another story as heretofore noted.

January 23, 1870, the board voted to pay a sewer tax upon the south half of the square. In 1874 the board again submitted to the people a proposition to raise $150,000 to build a court-house upon the court-house square, which was defeated by a vote of 3,130 for, to 4,305 against.

In January, 1881, the prosecuting attorney was directed to institute legal proceedings, as he might see fit, to determine the question of the title of the county to the square; and by the sanction and direction of the board possession of the premises was taken, and the same inclosed by a fence, and these suits commenced. The fence was completed on the eighth day of October, 1881, and was not molested by the city until October 24, 1881, when the marshal was ordered to tear it down. Between these dates, and on the thirteenth of October, the city presented an assessment of $208 against the court-house square for the paving of Monroe street, which the county paid, and received the receipt of the city treasurer therefor.

The city of Grand Rapids, as shown by the proceedings

of its common council, does not seem ever to have held the south half of this public square adversely to the county. In fact, its whole supervision of both halves of the square has been but little if any more than citizens have forced out of it, to take this open spot under its control for the purpose of keeping it clean, and accommodating the public as its use, with the growth of the city, became more and more desirable to the people for purposes of amusement. In October, 1850, the people wanted an appropriation to fence it. The council instructed a surveyor to survey it, leaving on each side a space of four rods for streets, and allowed the petitioners to build a fence at their own expense. At this time it is admitted that the county had taken no steps to abandon it, and were holding courts there; nor had the title of Campau been then acquired by the city.

August 12, 1852, the city acquired the title of Campau to the north half of the square, as heretofore noted, and paid him the sum of $500 therefor.

From 1850 to 1862 no authority seems to have been exercised over the ground, and the only action, outside of offering to quitclaim to the county, of the common council, was to lay upon the table a petition of citizens asking for an appropriation of $100 to improve it, refusing to instruct the marshal to prosecute persons for allowing swine and cattle to run thereon, and letting it once to a circus performance.

In 1862 an association of citizens, upon request of said citizens, were allowed to plant trees upon it *without expense* to the city, and the council paid for painting the fence erected by the citizens under the permission granted in 1850.

Nothing further appears until 1865, when Mr. Gilbert was given the privilege of cultivating the grounds, and exclusive control for two years, to seed the premises at the end thereof, *without expense* to the city.

In 1867 the marshal was instructed to deposit 100 loads of dirt, the scrapings of the street, upon the public square.

In 1872 the marshal sold the grass on the premises for $10, and paid the same into the city treasury.

This is the sum total of the action, possession, or control

of the city from 1850 to 1873, when the first public improvement was made by the city, an appropriation of $100 being voted in May of that year to "improve said park." In the same year a speaker's stand was built thereon, and the marshal instructed to see that the trees and grounds were properly protected. A gas-pipe was also laid to the music stand, and the fence again painted.

In 1874, 1875, and 1876 the gates and fences were repaired, and sticks and stones removed, and in the latter year two drinking fountains and some benches placed in the square, or park.

In 1878 walks were constructed, and the fence removed. The square was not put under police surveillance until in September of that year, after a communication from the chief of police, setting forth that the park was in a most filthy condition, and resorted to by men and boys for the purpose of committing nuisances.

Since that date the park, or public square, has been looked after a little more closely by the city authorities, but no great expenditure has been made upon it.

It will be seen that the first dollar expended upon the ground, save the purchase money paid to Campau, was in 1873, only eight years before the commencement of these suits, the improvements before that time being the work entirely of private parties.

The jurisdiction over the square upon the part of the city up to that date was no more than the customary exercise of a municipality over open and public places within its limits, and not at all inconsistent with or adverse to the title claimed by the county.

As showing the intention of the city in assuming the control it did, we find the authorities, at two different times, offering their claim without recompense to the county in case the court-house should be located thereon. In 1850 they offered to quitclaim the interest of the city to the commissioners appointed by the Legislature to locate the county-seat, and again, in 1866, the council tendered to the committee of the supervisors to receive proposals " all the right of the city

to the public square for the purpose of locating the court-house and other public buildings thereon."

In recognition of the right of the county to hold this square, we find the city presenting and receiving pay for accounts against the square as follows: 1866, grading and paving Fulton street on the south side of public square; 1870, sewer tax upon the south half of the square ; and in 1881, $208 assessed against the "court-house square" for the paving of Monroe street. The first two payments appear to be on account of the south half alone, but the last, without any other explanation to be found in the record, seems to run against the whole property.

I am satisfied that the city, under the showing made, has not established any title by adverse possession against the county to either half of this square.

But it is argued that the title to the north half is good because of the conveyance by Louis Campau in 1852; that the county abandoned the premises in 1851 ; and that thereupon the land reverted to Campau, who took possession thereof, and held such possession at the time he so deeded his interest to the city.

But, as heretofore shown, the county has never abandoned the premises, unless by non-user. As at the time of Campau's conveyance to the city the county had only ceased holding courts thereon for less than eight months, Campau could have gained no title thereto by reason of non-user.

In my opinion, after the dedication of this piece of land by Campau for the purposes of a court-house, and the acceptance and use of it by the county for nearly fourteen years, the mere fact of selling the temporary building, unfit for court purposes any longer, to him, and the non-user of the premises for a year, while a quarrel was going on about the location of county buildings elsewhere, without any definite result, could not revest him with the absolute title in fee, the same as he held before such dedication and acceptance : *Baker v. Johnston*, 21 Mich. 350. He could convey to the city the title he had, after dedication, in the soil, but it would be subject to the public use conferred by such dedication.

There is no doubt whatever, from Campau's own statements, that he gave this part of the square for court-house purposes, and from his deed to the city it is to be implied that in making such transfer he did not intend to divert it from such use; and the act of the city authorities, in tendering the title thus acquired to the county for such purposes in 1866, is not in harmony with their theory that they acquired the same for a public park, nor does the character of their supervision of the grounds from 1852 to 1873, a period of twenty-one years, tend at all in that direction.

The inquiry now arises as to what effect the non-user of this public or court-house square from 1852 to 1881 has had upon the rights of the county of Kent in the premises.

By the original dedication and acceptance of this square the county became vested with an estate therein in the nature of an easement. The ownership in fee is not claimed, but the right of the use of the premises for a court-house and county buildings.

Whether an easement or right of this kind can be lost by mere non-user is not settled to a certainty by the authorities. It must, at any rate, continue so long as to raise a reasonable presumption of abandonment: *Hatch v. Dwight*, 17 Mass. 289; *Wilder v. St. Paul*, 12 Minn. 208; Washb. Easem. 550–1 (edition of 1863); and what length of time is sufficient to create this presumption must be determined by the circumstances of each particular case. But such non-user must always have been of as long duration as the period that is required in order to gain the easement by user—Washb. Easem. 551–2 (Id.)—and it is rarely, if ever, lost unless there is some evidence, outside of the mere non-user, showing an intent to abandon it, or there has been such use by the holder of the fee in or over the easement as to indicate a claim of right which is adverse to the enjoyment of the easement: Id. 551. *Ward v. Ward*, 7 Exch. 838; *Townsend v. McDonald*, 12 N. Y. 381; *Smyles v. Hastings*, 22 Id. 217; *Wiggins v. McCleary*, 49 Id. 346; *White v. Crawford*, 10 Mass. 188: *Arnold v. Stevens*, 24 Pick. 106–113; *Owen v. Field*, 102 Mass. 90–114; *Barnes v. Lloyd*,

112 Id. 224. There must be, to constitute such adverse use, an actual, continued possession by some one, with a claim of adverse title, and with an open and notorious assertion of right or title against the owner of the easement: *Livermore v. City of Maquoketa*, 35 Iowa, 358; *Humbert v. The Rector*, 24 Wend. 587.

And in this case, where the dedication of a public square has been accepted and used for the purposes dedicated, a serious question arises whether the dedication is not irrevocable so long as the ground is not put to other uses and no court-house is built elsewhere. It is doubtful if any mere non-user in such case—the simple holding of the premises in abeyance without any use, but without any diversion from the purposes of its dedication—for any length of time, will work an abandonment or extinguishment of the easement: *Wilder v. St. Paul*, 12 Minn. 208; 2 Smith, Lead. Cas. 277.

The use of the premises in dispute here has never been inconsistent with the present or future occupation of the same for the uses and purposes of its dedication. Private persons have never interfered with its public use. The control of the city authorities, up to 1873, had in it no element of adverse use. It was simply a control that all municipalities exercise over common or open places within their limits; and the control was so slight, as heretofore shown, as to carry with it no impression of an assertion of title. Since that time the possession and occupancy of this square by the city, if such possession can be called actual or adverse, has not been of sufficient duration to ripen into a title as against the county. The square has never lost its identity as the court-house square, and until it does must be considered still open to the public uses of its dedication: *Townsend v. McDonald*, 12 N. Y. 381; *Hunter v. Sandy Hill*, 6 Hill, 407.

There is no evidence connected with this non-user showing an intention on the part of the county to abandon its rights in the premises. It is true, the supervisors were shuffling about and quarreling among themselves as to the location of a county-seat from 1852 to 1866, for exactly the same number of years that they had before that used the

square for court-house purposes; but in 1866, before any adverse possession or control was taken of the same by the city, the board of supervisors determined to locate the county-seat and court-house upon it, to which determination they have ever since adhered.

Because no court-house has thus far been built upon this ground is no evidence of an intention to abandon it for that purpose, so long as none has been erected elsewhere. Nor does the fact that the people have voted down appropriations to build the same affect the title of the county to this square. It is rather an evidence of a refusal to raise money to build a court-house at all than of an expression against the site of its location.

If, after the burning of the court-house in 1844, none had been erected in its stead, and no movement had been made or entertained by the supervisors to locate one elsewhere, and the failure to build one had rested alone upon the fact that the people had not been ready to vote money for that purpose, it would not, I think, be seriously contended that the non-user of the county, or the control of the city, as shown by this record, would have been in law an abandonment or extinguishment of the rights of the county in this square.

I find, as heretofore shown, in the proceedings of the supervisors, no fixed or settled intention of abandonment, but rather a purpose, during all the discussion of contemplated changes, to hold on to this public square for court-house uses; and, there being no adverse enjoyment by others sufficient to extinguish the right of the county, under the dedication and acceptance of the same, to use this public square for court-house purposes, it follows that such right has not been lost by the mere non-user of the premises.

It is also urged that the county, under its showing, if it has the right and title claimed, has a perfect and adequate remedy at law; that an action of ejectment would lie for the possession of the premises; and also that the complainant had no such possession, at the time of filing its bills of complaint, as would entitle the county to file a bill to quiet title under the statute; that the possession taken by the supervisors in fenc-

ing and occupying said square was for the express purpose of commencing these suits, and was nothing more nor less than a trespass against the city, which really had possession.

No demurrer was filed in either case, or claim of demurrer embraced within the answers.    The county, as before shown, has only an easement for public uses in this square.    The fee is in other parties.    The right of possession for the purposes of building a court-house upon the land is the right disturbed or threatened, and for the settlement and determination of. this right these suits were brought.    We do not consider it necessary to determine whether or not ejectment would lie for this right of possession under our statutes.

I have no doubt of the right of the complainant, in equity, to ask a determination and protection of its right in the premises, or of the power of the court to grant the relief asked.    *Watertown v. Cowen*, 4 Paige, 510.    And I also think that, at the time of the filing of these bills of complaint, the county had sufficient and adequate possession to ask the quieting of its title.[1]    No other person or municipality, as heretofore shown, had any actual or exclusive possession of the premises at the time of the entry by the county. It completed its fence October 8, and no one interfered with such possession until October 24.    The county had the right to take possession, having never lost its title under the dedication.    It was in no sense a trespasser against the city, or any one; and, when it had actually occupied the premises under this right, it was competent for it to invoke the aid and interposition of equity to protect its possession against a threatened invasion thereof.

For these reasons, given at length because of the import-

---

[1] How. Stat. § 6626, as amended by Act 260, Public Acts of 1887, p. 337, reads as follows: "Any person claiming the legal or equitable title to lands, whether in possession or not, may institute a suit in chancery against any other person, not in possession, setting up a claim thereto in opposition to the title claimed by the complainant, and if the complainant shall establish his title to such lands, the defendant shall be decreed to release to the complainant all claims thereto, and pay costs, unless the defendant shall, by his answer, disclaim all title to such lands and give a release to the complainant, in which case costs shall be awarded as the court may deem just."

ance of the questions involved, I am unable to agree with my associates as to the disposition of these cases. In my opinion, both decrees were right in the court below, and ought to be affirmed.