THE MAYOR AND COMMON COUNCIL OF NEWARK, PLAINT
IFFS IN ERROR, v. GEORGE WATSON ET AL., DEFEND
ANTS IN ERROR.

1. The legislature, in the exercise of its police power, can lawfully pro-
hibit the use of lands for the purposes of burial when such lands are
held by a municipal corporation.

2. The plaintiffs, a municipal corporation, held lands under a grant from
the proprietors of East New Jersey for burial purposes, to be appro-
priated for no other use or uses whatsoever. An ordinance of the
municipality and an act of the legislature prohibited the use of such
lands for burial purposes. *Held*, that the title to the lands thereby
reverted to the proprietors.

3. Twenty years' adverse possession will establish a title against the pro-
prietors. *Quære*—Whether the first section of the act of June 5th,
1787 (*Rev., p.* 598), which provides that sixty years' possession, actual
and uninterrupted, shall vest a complete title to lands, will defeat the
title of a municipal corporation.

In error.

For the plaintiffs in error, *Joseph Coult, Howard W. Hayes*
and *Cortlandt Parker.*

For the defendants in error, *John R. Emery, Frederic W.
Stevens* and *Thomas N. McCarter.*

The opinion of the court was delivered by

VAN SYCKEL, J. The writ of error in this case brings
up for review the judgment of the Supreme Court in an
action of ejectment brought by the mayor and common coun-
cil of the city of Newark against George Watson as tenant
and the trustees of the Second Presbyterian Church of New-
ark as landlords, to recover possession of a small parcel of
land in the city of Newark, which is part of a lot situate at
the southeasterly corner of Broad and Market streets, in said
city, and was originally designated as the "Old Burying-
Ground." This, with other lands, was conveyed by the pro-

prietors of the province of East New Jersey by deed dated
December 10th, 1696, to John Curtis, John Treat, Theophilus
Pierson and Robert Young, to have and to hold to them, their
heirs and assigns forever, to the only proper use, benefit and
behoof of the "old settlers of the town of Newark for a
burying-ground, and to be appropriated for no other use or
purpose whatsoever."

On the 7th of June, 1753, George II. granted a charter
to the First Presbyterian Church, by which the society was
incorporated under the name of the "Trustees of the First
Presbyterian Church in Newark," with power to hold and
convey lands.

The town records of the town of Newark, under date of
March 12th, 1760, show the following resolution : "Whereas
David Young of Hanover, Morris County is thought by some
to be heir-at-law of our Parsonage patents, as he is the heir
of Robert Young the oldest patentee, it is thought by some
proper, that this vote be put, whether the Trustees of the
First Presbyterian church at Newark shall apply to said
David Young for a deed of conveyance to them in trust, that
the said trustees may be the better enabled to be guardians
for the same for said church." This vote was accordingly
put and the resolution unanimously passed.

Prior to this time a meeting-house had been erected upon a
part of the lands conveyed by the proprietors' deed, and
Robert Young, who had survived the other trustees named
in said deed, was also deceased, leaving the said David Young,
his oldest son and heir-at-law, surviving him.

In pursuance of said resolution, David Young, on the 13th
of March, 1760, executed a deed for a certain portion of said
lands to the trustees of the First Presbyterian Church of
Newark.

The trustees of the First Presbyterian Church of Newark,
by deed dated March 24th, 1827, conveyed the same premises
to the defendant "The Trustees of the Second Presbyterian
Church of Newark."

The plaintiffs deny that these deeds embrace the *locus in*

*quo.* In my judgment, this contention is not well founded. The deed of March 13th, 1760, describes lot 7 as " that small tract [allotted for the burying-place] taking in the pond and meeting-house." From this statement it appears that the meeting-house was erected on the burying-place and that it was intended that the said conveyance should include the *locus in quo.* It is also clear that such was the understanding of the framer of the act of 1825. This, however, is not material in the view which will be taken of this case. There is no doubt that the grantees in these deeds, as well as the inhabitants of the town, assumed that the title to the *locus in quo* passed by the deeds, as it is incontestably shown that, from April 22d, 1784, the premises in question have been occupied by tenants under leases from the First Church up to March 24th, 1827, and since that date by tenants under leases from the Second Church.

On the 15th of February, 1804, the legislature passed an act entitled "An act to vest in the inhabitants of the township of Newark, in the county of Essex, a certain estate now in the hands of trustees."

The first section of this act provided that the trust estate vested in the trustees named in the proprietors' deed of the 10th of December, 1696, should henceforth cease and be void. The second section provided that the estate vested by said deed in the said trustees should be vested in the inhabitants of the township of Newark, as incorporated by law, and their successors forever, and that they should be vested with the legal title as fully and absolutely as though they had been originally named in said deed in the place of said trustees. " Provided also that nothing herein contained shall in any way extend to or affect the parsonage lands contained and particularly described and expressed in said grant; and also such parts of the burying-ground mentioned and described in said grant as have either been leased or sold by the trustees of the First Presbyterian church in Newark previous to the first day of January last; and also the ground on which the market in said town of Newark now standeth."

The lot, of which the *locus in quo* is part, was leased by the trustees of the First Presbyterian Church to David Baldwin, April 22d, 1784.

By an act of the legislature passed November 4th, 1825, the trustees of the First Presbyterian Church were authorized to convey said lands in fee to the trustees of the Second Presbyterian Church, and under and by virtue of that act the deed of March 24th, 1827, was made to the latter church. At a town meeting held April 13th, 1829, it was resolved that no more interments should be made in the old burying-ground. On the 3d of March, 1848, the legislature passed an act which is of controlling importance in this case, the title of which is "An act requiring the mayor and common council of the city of Newark to protect and keep in repair the old burying-ground in said city, and quieting the possession of such parts of said burying-ground as are already occupied."

The preamble recites as follows:

" WHEREAS, The old burying-ground of the city of Newark hath for years ceased to be used as a place for burying the dead; *and whereas,* it has so occurred by lapse of time that a portion of the land originally allotted for the purpose of a burying-ground, lying adjacent to the premises now designated by enclosures as the old burying-ground, has been appropriated for other purposes, and has been improved for the most part by erecting thereon expensive buildings; *and whereas,* it hath been insisted that the portion of said ground appropriated and occupied otherwise than for a burying-ground should be restored to the use for which it was originally set apart, and according to the trust to which it is alleged the same is subject, which would be attended with great inconvenience, and subject innocent purchasers to great pecuniary loss, and be of no public utility, inasmuch as the location of said ground renders it improper and inexpedient to make any further interment therein; *and whereas,* it is desirable that the said burying-ground, enclosed as aforesaid, should be protected, and that

the occupancy of the portion occupied otherwise than for a burying-ground should be quieted; therefore,

"BE IT ENACTED *by the Senate and General Assembly of New Jersey,* That it shall be the duty of the mayor and common council of the city of Newark to protect and preserve the burying-ground, as now enclosed as aforesaid, and the enclosures thereof; and that the occupation of such parts of said ground, originally allotted as aforesaid, as are now occupied for purposes other than as a burying-ground as aforesaid, shall remain undisturbed, and that the mayor and common council of the city of Newark shall apply such proceeds and profits thereof as they may receive to the protecting and keeping in repair the burying-ground aforesaid and the enclosures thereof; *provided, nevertheless,* that nothing in this act contained shall in any manner affect the vested rights, if any, of any person or persons in the said lands, independent of the said alleged trusts; *and provided,* that this act shall not confer any additional rights to any person or persons, as to the lands south of the town lot bordering on the said burying-ground and which have within the last ten years been enclosed."

Thus it appears that, by the resolution of the town meeting in July, 1829, the *cestuis que trust* refused to use the *locus in quo* for the only use to which it was held for them under the proprietors' deed, and the act of the legislature of 1848 provided that it should no longer be used for such purposes.

The last-mentioned act, after reciting that portions of the burying-ground had been appropriated to other purposes, and improved for the most part by building thereon, and that it would be improper to make further interments therein, expressly enacts that such parts of said ground as are so occupied for other purposes shall remain undisturbed.

The effect of this recital and provision was to constrain the city to abandon the only use for which it held this land.

The act of 1804 declares that the trust estate vested in the trustees by the deed of 1696 shall cease, and that the legal

estate as·well as the beneficial use shall be vested in the inhabitants of the township of Essex.

This act does not purport to enlarge the uses or to divert these lands from the uses to which they were devoted by the deed of the proprietors, and I have found no limitation upon the power of the lawmaker to dispense with the necessity of a trustee in dealing with the rights of a public corporation.

The effect of the proviso was to circumscribe the operation of the act of 1804, so that it vested in the township the legal title to such lands only as were not within the proviso. Under the rule for the construction of statutes, the proviso operated neither to convey lands within its terms, nor to discharge such lands from the trusts originally imposed. It was potent, however, to withdraw the premises mentioned in it from the effect of the body of the act, thereby excluding such lands from the legal estate granted by the act and leaving the legal estate in them where it previously was, and subject to the public trusts which had been declared in the grant.

But the act of 1825 has a far wider range. It purports to authorize and validate a conveyance in fee by a municipal corporation to a religious body, of lands conveyed in trust to be used by such municipality for the sole purpose of a burying-ground, not only thereby discharging the sole public use, but devoting the lands, in contravention of the owner's grant, to a wholly different and private charitable use.

Whether any stable foundation can be found in the law for such legislation is very doubtful.

The importance of the acts of 1825 and 1848 is that the lands in controversy were thereby discharged from the trusts they were originally subject to.

No title vested in the municipality under the original patent of 1696. That title first became vested in it by the act of 1804. *Newark* v. *Stockton,* 17 *Stew. Eq.* 179. That act having excluded from its operation the lands now in question, the right of the township as to them was a right of possession merely, as incident and essential to the duty assumed for the

protection and preservation of the dedicated premises for the purpose of enabling the public to avail itself of the declared uses.

The questions, therefore, to be solved are whether the legislature had the power, with the concurrence of the beneficial owners of the land, to abolish and prohibit the sole use for which such owners held it, and if so, what consequences flow from the exercise of that power.

The power of the legislature to restrain or prohibit the use even of private property in a way detrimental to the public health or safety, is beyond dispute.

The case of *Mugler* v. *Kansas*, 123 *U. S.* 623, shows how comprehensive and broad this power is.

In that case the federal court declared that it was the province of the legislature primarily to determine whether the public health or morals required the exercise of this power, although it must be settled ultimately by the courts whether, in any given case, the legislature has exceeded its prerogative.

All rights are held subject to the power of the state over the public health and morals. *Boston Beer Co.* v. *Massachusetts*, 97 *U. S.* 25; *Butchers' Union Co.* v. *Crescent City Co.*, 111 *Id.* 746; *New Orleans Gas Co.* v. *Louisiana Light, &c., Co.*, 115 *Id.* 650.

It being competent for the legislature not only to change and modify political districts, but also to dissolve them at pleasure, its power to control and extinguish the uses to which property may be held by such political districts must be wider than that which pertains to the property of private persons.

Mr. Justice Depue, in delivering the opinion of this court in *Hoboken Land and Improvement Company* v. *Hoboken,* 7 *Vroom* 540, 549, said that "the legislature alone has the power to release the dedicated lands and discharge the public servitude when once it has attached."

The right of the legislature to forbid a municipal corporation to appropriate its lands within corporate limits to burial purposes is incontrovertible. Such enactments are not unconstitutional, either as impairing the obligation of contracts or

taking private property for public use without compensation; they are unassailable as an exercise of the police power. *Coates* v. *Mayor of New York,* 7 *Cow.* 585; *Tiedeman Lim. Pol. Pow.* 122. Whether there is any limitation upon this rule as applicable to private cemetery companies may present a different question. Where the absolute fee in lands is acquired by a municipal corporation, although with an expressed intention of using it for a special purpose, the property acquired may be applied by legislative authority to a wholly different public object, but where the grant to the corporation is only for a specified use, the grantor retains the reversionary estate. *Heard* v. *Brooklyn,* 60 *N. Y.* 242. This is a familiar rule as applicable to lands dedicated for public highways or taken under the power of eminent domain.

In *Supervisors* v. *Grand Rapids,* 61 *Mich.* 144, lands were donated to a county for county seat purposes, and the county seat was afterwards removed elsewhere. In an action of ejectment to recover possession of the lands, it was held that the county had no interest in them.

In *Youngs* v. *Board of Commissioners,* 51 *Fed. Rep.* 585, the lands were donated by the owner of the fee to a municipal body for a burying-ground, and that body afterwards passed an ordinance prohibiting the further use of it for such purposes. The ordinance was declared to be a valid exercise of the police power, and also to operate as a complete abandonment of the dedicated use, by which the lands reverted to the original owner.

This rule will not apply where the use can be enforced by an application to equity to compel a specific execution of the trust.

The case before us is not within this exception. There is no power in a court of equity to compel an appropriation of the *locus in quo* to be made to burial purposes in contravention of the resolution of April 13th, 1829, and the act of 1848 before recited. There has been an actual and complete abandonment and prohibition of the use, and an inability on the part of equity to intervene for more than forty years.

By the absolute extinction of the sole use for which the plaintiffs held this land, the fee reverted to the original proprietors of East New Jersey, and the title being thereby, after 1848, in the proprietors and not in the plaintiffs, the statute of limitations began to run in favor of the defendants in ejectment in 1848.

The sole use for which the trustees held the title under the proprietors' deed has long since been extinguished, and there has been no existing public right in the *locus in quo* since the passage of the act of 1848, which impeded the running of the statute of limitations as against the proprietors or as against the trustees and their heirs, if they continued to hold the bare legal title discharged of the public use. If we assume that the title did not revert to the proprietors, but that the legal title remained in the trustees stripped of the trust, the result is not changed. The object of the proprietors' conveyance had wholly failed. The trust was barren and its execution prohibited. There remained in the public no interest in the land to which the rule *nullum tempus* could apply.

There was no public right to be saved, and nothing to hinder the running of the statute of limitations against the holders of the legal title.

My conclusion is that the defendants have acquired title by adverse possession under the seventeenth section of the act for the limitation of actions, which provides that every action for lands shall be brought within twenty years after the right or title accrued. It also appears in the case that, aside from the operation of the statute of limitations, the defendants have acquired the proprietors' title to the *locus in quo*.

On the 9th of September, 1857, the proprietors granted to Van Buren Ryerson their title to the burying-place.

This title was sold in September, 1862, to Joseph A. Halsey, by the sheriff of Essex county, under a judgment and execution against Ryerson. Halsey, on the 1st day of July, 1865, conveyed to the trustees of the Second Presbyterian Church in Newark, the defendant in ejectment. This renders it unnecessary to discuss the important question,

whether the first section of the act of June 5th, 1787 (*Rev.,* p. 598), which provides that sixty years' possession, actual and uninterrupted, shall vest a complete title to lands, will run against a municipal corporation.

The judgment below should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, ABBETT, DIXON, GARRISON, LIPPINCOTT, MAGIE, REED, VAN SYCKEL, BOGERT, BROWN, KRUEGER, SMITH.    13.

*For reversal*—None.