# JUNE TERM, 1923.

## GLIDDEN v. BEAVERTON POWER CO.

1. WATERS AND WATERCOURSES—DEEDS—RESERVATIONS.

   Where a grantor reserved all flowage or riparian rights to the land conveyed, her grantee could convey no such rights, and therefore his grantees acquired no such rights although no reservations or exceptions were contained in their deed.

2. SAME—BONA FIDE PURCHASER—NOTICE.

   Although grantees' warranty deed contained no reservations or exceptions of flowage or riparian rights, where they had lived in the neighborhood for many years and knew of the progressive development of the water power, and the recorded deeds in their chain of title withheld and conveyed to others rights of flowage over their land, they cannot be said to be innocent purchasers.

3. SAME—RESERVATIONS IN DEED—CONSTRUCTION.

   Where a deed contained a reservation of flowage rights for a 20-foot dam, and grantee therein later conveyed with a reservation of "any dam," it may be inferred that the change in wording was made to provide that no rights of flowage whatever should pass, and by intentionally so providing no fraud was perpetrated either on her grantor or on her grantee in the absence of any claim that the latter misunderstood the import of said reservation.

4. SAME.

   Plaintiffs' claim that the right of flowage reserved by the words "any dam," only gives the right to overflow the land to the extent caused by the height of the dam then in use cannot be sustained; the wording rather implying anticipation of greater development in the future.

5. SAME—FLOWAGE RIGHTS AN INTEREST IN LAND.

   The right of flowage or to dam water back above its

As to reservation in deed of right to dam back water of stream, see note in 59 L. R. A. 830.

natural level is an interest in land of value, in its nature an easement which an owner of full title may reserve when disposing of the fee, or he may retain the fee and deed the right of flowage to others as a perpetual easement, and it can only be acquired by an instrument in writing under seal, in the nature of a deed of conveyance, or by prescription.

6. SAME—FAILURE TO USE DOES NOT IMPAIR TITLE.

An omission by the riparian owner to make use of flowage rights does not impair his title or confer any right thereto upon another; it not being the nonuser, but the adverse enjoyment of it by another for the prescriptive period which may destroy the owner's rights.

7. DEEDS—EXCEPTIONS.

An exception in a grant is said to withdraw from its operation some part or parcel of the thing granted which, but for the exception, would have passed to the grantee under the general description.

8. SAME—CONSTRUCTION—INTENT OF PARTIES.

A deed should be construed with reference to the state of the property and what was in contemplation of the parties when they acquired their respective rights.

9. WATERS AND WATERCOURSES—DEEDS—CONSTRUCTION—INTENTION OF GRANTOR.

A deed fairly indicating grantor's intention to convey *all* his flowage and riparian rights, *held*, to convey those in a 4½-acre tract previously conveyed to the same grantee by a deed reserving his rights to a 20-foot head flowage, and therefore excepted from this deed, although the wording of the exception is not as clear as rules of careful conveyancing would suggest.

10. DEEDS — CONSTRUCTION — REPUGNANT CLAUSES SHOULD BE HARMONIZED IF PRACTICABLE.

In case of any repugnancy in different clauses of a deed, all parts should be made to harmonize if practicable, upon consideration of the whole instrument.

Error to Gladwin; Smith (Guy E.), J.    Submitted October 17, 1922.    (Docket No. 105.)    Decided June 7, 1923.    Rehearing denied October 1, 1923.

Case by Enoch Glidden and another against the

Beaverton Power Company for damage to land by flooding. Judgment for defendant on a directed verdict. Plaintiffs bring error. Affirmed.

*Kinnane & Leibrand,* for appellants.

*Campbell & Foster (J. C. Shaffer,* of counsel), for appellee.

STEERE, J.   Defendant owns and controls a development of hydraulic power, known as the "Ross dam," located in the city of Beaverton, Gladwin county, on the Tobacco river about a quarter of a mile below its confluence with the Cedar.   Plaintiffs own a piece of land located at and to the north and west of the junction of those streams, bordering on both and consisting of about 4½ acres described as all that part of the northeast quarter of section 12 in township 17 north, range 2 west, that lies east of the county road and west and north of the Cedar and Tobacco rivers in the city of Beaverton, Gladwin county, Michigan. They brought this action to recover for damage done said land by flooding imputed to defendant's dam. Defendant under a plea of the general issue gave notice of  claimed flowage rights over plaintiffs' land acquired from their predecessors in the chain of title. The nature and extent of those rights are the issues involved.   Plaintiffs, who are old residents in that locality, bought this piece of land in 1914 from Charles W. Barrett who gave them a warranty deed containing no reservations or exceptions.   Barrett acquired his title to the property from Mrs. Leo Ross by a deed dated May 2, 1911, and duly recorded on May 6, 1911, containing the following description and reservation:

"All that part of the north half of the northeast quarter of section twelve (12) in township seventeen

(17) north of range two (2) west that lies east of the county road and west and north of the Cedar, Tobacco rivers, in the city of Beaverton, Michigan, excepting and reserving to first parties, their heirs and assigns in perpetuity, all flowage and riparian rights of every kind, including the rights to overflow and flood with water any part of said land which may be overflowed by reason of the construction and maintenance of any dam at Beaverton, Michigan."

The testimony was largely documentary. Plaintiffs introduced oral evidence that since they purchased this 4½-acre tract the height of the Ross dam and level of the water upon which the tract bordered had been raised 8 feet or more to near the level of their yard and buildings, seriously damaging the same. Defendant introduced no testimony upon that issue, but at conclusion of the testimony defendant's counsel moved for a directed verdict in its favor based particularly on the documentary and recorded evidence of title claimed to establish its right of flowage over this land. The trial court so held and directed a verdict for defendant. Plaintiffs bring the case here on writ of error to review the decision of the court on that issue.

Both parties appear to trace their respective titles to a common source through the same deeds to Leo Ross, wife of Ronald Ross. The language quoted from the deed of Leo Ross to Barrett, dated May 2, 1911, makes evident that he acquired no riparian or flowage rights to this land which it was in her power to except from the deed, or reserve to herself. Plaintiffs could acquire no flowage or riparian rights which she had reserved, through their deed from Barrett executed three years later than her recorded deed to him. A reason for her reservation in the Barrett deed appears in a deed of the property given her by Jacob Schwartz and wife, dated May 1, 1911, and

recorded June 6, 1911, which contains the following description and exceptions:

"All that part of the north half of the northeast quarter of section twelve in township seventeen north of range two west, that lies east of the county road and west and north of the Cedar and Tobacco rivers, in the city of Beaverton, Michigan.

"Excepting and reserving to first parties, their heirs and assigns in perpetuity, all flowage and riparian rights of every kind including the right to overflow and flood with water any part of said land which may be overflowed by reason of the construction and maintenance of an artificial dam having a twenty-foot head of water at Beaverton, Michigan."

Jacob Schwartz acquired title to this tract with other property under a deed given him by Miles J. Purcell, trustee of William Ross and Ronald Ross, bankrupts, dated April 4th, and recorded April 6, 1908. The record shows this deed given by order of the bankruptcy court in acceptance of bid No. 1 of Jacob Schwartz reading as follows:

"1. For the saw mills, elevator, barn, shingle mill and post mill, power and electric light plant and contracts, dam and flowage rights, water power plant, telephones, property and contracts, and on a number of city lots, by Jacob Schwartz, $13,240.00."

The 4½ acres involved here is included in piece or parcel of land described in paragraph 5 of the trustee's deed as the "north half of the northeast quarter of section twelve in town seventeen north of range two west," excepting therefrom a small parcel of land in the northwest corner, described by metes and bounds, previously sold to Esther Ann Michall, and also certain rights, conditions and reservations contained in a deed given to the Ross brothers in 1902 by the Pere Marquette Railroad Company, neither of which affect the land involved here. Paragraph 11 of the trustee's

deed also contains the following description of rights conveyed:

"All rights of flowage or riparian rights, including the right to overflow or flood or saturate with water by the construction and maintenance of an artificial dam or otherwise in perpetuity along the Tobacco river in the township of Tobacco and also all rights of flowage along any of the branches of the Tobacco river in the township of Beaverton, and also rights of flowage along the Cedar river in the township of Buckeye, Beaverton and Tobacco. It is the intention to convey all rights to which Ross Brothers have heretofore acquired or to which they may be entitled in the flowage or otherwise along said stream in the said township as above referred to. It being the intention to hereby convey each, every and all of the interest of whatever kind or character which William Ross and Ronald Ross had in the right to flow lands upon the Tobacco river or its tributaries, and all riparian rights of whatever kind or character pertaining to the right to flow or use lands for the purpose of flowage along the Tobacco river or its tributaries, hereby conveying all the uses which appertain to the dam site at Beaverton, Michigan."

At the time Ross Brothers went into bankruptcy they had operated extensively in that locality for many years. They had owned and developed this water power site and held title to a large acreage along the shores above it. Plaintiff Enoch Glidden testified he had worked for them on that river 30 years before. They were adjudged bankrupts in 1907, and the following spring Purcell as trustee in bankruptcy sold Schwartz the water power development and business at Beaverton. This included the dam and pond immediately above, the land upon which they rested and flowage rights appertaining to the development.

In December, 1909, Purcell as trustee in bankruptcy of William Ross sold to Leo Ross of Beaverton, wife of Ronald Ross, all the flowage and riparian rights

belonging to said estate upon either side of the Tobacco river between its intersection with the western boundary of the city of Beaverton and the western boundary of section 16 in town 17 north of range 1 west.

Having acquired William Ross' right of flowage above the dam Mrs. Ross purchased from Schwartz this water power property and received from him a deed therefor dated September 5, 1911, containing various descriptions. By paragraph 2 he conveyed to her all that part of lot 2 of section 7 in town 17 north of range 1 west except a portion platted as Riverside Addition to Beaverton, and by paragraph 3 all that part of lot numbered 3 of section 7 in town 17 north of range 1 west, lying north of the plat of Beaverton, following in description the government survey which shows the west half of northwest quarter of section 7 in town 17 north of range 1 west was divided into lots 2 and 3, the former being north and east of Tobacco river and the latter south and west of it, the river with its general course east and west having various windings in that locality leading it in different directions.

Paragraph 4 of the deed conveys that part of the southeast quarter of the southeast quarter of section 1 in town 17 north of range 2 west lying east of the Cedar river. Said lots 2 and 3 in section 7 are adjacent to the north half of the northeast quarter of section 12 in the same township (17 north, range 2 west). By the description in paragraph 5 said north half of the northeast quarter of section 12 is conveyed with the same description and exception as in the deed from Purcell to Schwartz followed by four other exceptions with somewhat lengthy descriptions and statements; these exceptions being the tract out of the northwest corner, "containing one acre," before sold to Esther Ann Michall, a parcel with a lengthy

description, before sold to the Saginaw Milling Company, and two other descriptions as follows:

—"and excepting also a parcel described as follows: All that part of 'the north half of the northwest quarter of said section twelve, town seventeen north of range two west that lies east of the county road and west and north of the Cedar and Tobacco river, being land conveyed by Jacob Schwartz to Leo Ross May 1, 1911 (being the 4½ acres involved here), also excepting a parcel described as follows: Commencing on the north one-eighth line of said section twelve at a point north of the northwest corner of lot 1 in block 1 of Bliss, Brown and Ryan's addition to Beaverton, and running thence north to the Tobacco river, thence easterly along the south margin of the Tobacco river until the same intersects with said one-eighth line; thence west along said one-eighth line to the point of beginning, being land conveyed by Jacob Schwartz to Leo Ross, May 11, 1911, and also subject to the rights, reservations and conditions contained in deed of the Pere Marquette Railroad Company to William Ross and Ronald Ross, dated August 27, 1902," etc.

Following the various paragraphs of descriptions the concluding paragraph of the deed conveys in practically the same language all riparian rights acquired by Schwartz under his deed from Purcell and saying:

—"it being the intention to convey each, every and all of the interest of whatever kind and character in the right to flow lands upon the Tobacco river or its tributaries, and all riparian rights of whatever kind and character pertaining to the rights to flow or use lands for the purpose of flowage along the Tobacco river or its tributaries, pertaining to the dam site at Beaverton which first party acquired under deed from Miles J. Purcell as trustee of the bankrupt estate of Ross Brothers dated April 4, 1908, and intending also to convey the flowage, flooding and all riparian rights of whatever kind and character which first party acquired under deed from Ronald and Hattie Ross dated April 6, 1908, and recorded April 16, 1908, in liber

18 of deeds on page 136 in the office of the register of deeds for Gladwin county, Michigan."

On April 30, 1919, Ronald Ross and Leo Ross, husband and wife, conveyed to the Beaverton Power Company the flowage rights upon 3,280 acres of land in the county of Gladwin along those waters, describing them in detail,

"also, the present dam and power house, now completed, located in the northwest corner of the southwest quarter of the northwest quarter of section 7 in the city of Beaverton, and on the Tobacco river, county of Gladwin, State of Michigan. Also, the distribution system in the city of Beaverton, Gladwin county, Michigan, comprising poles, wires, transformers, meters, etc., which are now in use and occupation."

Defendant is a Michigan corporation organized under appropriate laws for the business it carries on, having a capital stock of $250,000 described as all paid in. Its articles of association, executed April 30, 1919, show the par value of its stock is $10 per share, held by the following stockholders: Ronald Ross, 12,000 shares, Leo Ross 12,000 shares, Henry Croll, Jr., 5,000 shares and Charles R. Kuehl 5,000 shares. In its items of property appears a conveyance of "rights of flowage of 3,280 acres of land," including in the descriptions plaintiff's piece. Also the northwest quarter and east half of section seven, town seventeen north range one west, valued at $223,325.

Enoch Glidden testified that when he bought this 4½ acres of Barrett about ¾ of an acre was flats and about 3¾ acres of his purchase was not submerged, that the tract is not level, its highest point being in the northeast corner with about half an acre some six feet higher than the land on which his house stands, which is "practically on a hill," but in 1920

the water began to rise and has now raised until it leaves him only about 2¾ acres unsubmerged and the water so close to the level of his house as to do his improvements serious damage. Of the changes from natural conditions, he said:

"I have made measurements about sixty rods above the dam to ascertain how much the present dam has changed the water above where it was normally before the dam was built and it is twenty-four feet higher."

But of the changes at his place since he became interested in 1914 he stated the Ross dam was then "about twelve or fourteen feet high" and "the water now is about 8 feet higher than it was in 1914." In the face of his knowledge from the beginning of the water power developments as they progressed and resulting changed conditions in connection with the preceding recorded deeds in his chain of title withholding and conveying to others right of flowage over his purchase, he cannot be said to have bought and taken possession as an innocent purchaser. By the direct recorded chain of title, it appears that this water power property and appurtenances to which Ross Brothers had held full title, including plaintiff's land, was conveyed with all riparian and flowage rights by Purcell as their trustee in bankruptcy to Schwartz under authority of the bankruptcy court.

Schwartz later deeded this small tract of 4½ acres to Mrs. Ross, but in his deed to her reserved and excepted in perpetuity "all flowage and riparian rights of every kind," *including* the right to overflow and flood any part of the land by a dam having a 20-foot head of water. Mrs. Ross almost immediately sold the property to Barrett, excepting and reserving "all flowage and riparian rights of every kind," and copied in her deed to him the wording of Schwartz's reserva-

tion in his deed to her, except that his including clause reads, "by reason of the construction and maintenance of an artificial dam having a 20-foot head of water at Beaverton, Michigan," and her's "by reason of the construction and maintenance of any dam at Beaverton, Michigan."

Of this variation in reservations in the two deeds, counsel for plaintiffs say Schwartz's reservation of flowage rights for a 20-foot head at the dam "was an extreme reservation," as the dam was then but 12 or 14 feet high, and that Mrs. Ross having accepted it in his deed to her "is presumed to have had in mind the same thing that Schwartz had in mind," and to say she changed her mind when or before she deeded the property to Barrett on the following day and conceived the idea of reserving any right of flowage which might be caused by a dam higher than 20 feet, "would be to accuse her of bad faith and the most contemptible fraud."    We find difficulty in apprehending the force of that contention.    Mrs. Ross was the wife of Ronald Ross, one of the Ross brothers who had prior to their financial troubles developed this water power from a small beginning to its then proportions and though in the bankruptcy court had not apparently lost all interest in that connection.    It may be conceded that she and Schwartz had in mind the same thing as to the terms of her purchase from him resulting in the deed which she accepted containing the reservation of flowage he saw fit to impose, but what else she had in mind or why she made the purchase are bare matters of conjecture.    The fact that when she sold and conveyed the property to Barrett she adopted the same form of reservation in her deed that Schwartz had inserted in his deed to her until she reached the including clause, and then took pains to change it from a dam of "20-foot head" to "any dam" at Beaverton, fairly infers that she had

in mind distinctly to provide that no right of flowage whatever should pass to Barrett by that deed. By intentionally so providing she certainly perpetrated no fraud on her grantor, Schwartz, and no claim is made that her grantee, Barrett, misunderstood the plain wording of her reservation or that any misleading representations were made to him as to its effect. He as purchaser dealing at arms' length without any fiduciary relations shown to exist between them is presumed to have acquired whatever knowledge he desired for his protection and assumed whatever risks the reservation implied.

Plaintiffs further contend that the right reserved to flood the land only gives a right to overflow it to the extent caused by the height of the dam then in use. In support of their contention counsel cite certain cases where the language used made special reference to an existing development, such as "any of said dams,"—"said mill race and the tail race thereof as they now stand," or other language of like import indefinite as to height, which the court construed under the circumstances shown as indicating an understanding and intent to convey according to the then conditions of the property. *Watson* v. *Bartlett,* 62 N. H. 447, from the syllabus of which counsel make their strongest quotation, involved a reservation in a deed, given in 1800, by which the grantor reserved "to myself the mill privilege and the right of flowing said premises on said lot." The grantor was then enjoying the "mill privilege" with a mill and dam of a certain height, and from that time until 1867 he and those claiming under him continued to occupy and use this mill privilege in the same manner with a dam of no greater height than when his conveyance was made in 1800. The court held that the reservation of right to flow the land was a right connected with

and for the benefit of the "mill privilege" and in the absence of more certain words of description the use of the privilege so limiting the flowage during all those years—over three times the statute of limitations—"acquiesced in by the owners of the mill privilege, was a practical construction of the deed and reservation, and a definition, location and establishment of the rights of the parties holding under the deed." The reservations in the two deeds under consideration here do not refer to any existing development, and by definitely reserving a greater height plainly point to anticipated future development. There then existed a floodage over this land caused by a dam 12 or 14 feet high. Schwartz in distinct language reserved flowage rights for a dam 20 feet high, and Mrs. Ross for "any dam" which might be built. Such language could serve no purpose but to make known anticipated greater development which subsequent events showed was not visionary or far remote.

The right of flowage or to dam water back above its natural level is an interest in land of value, in its nature an easement which an owner of full title can reserve when disposing of the fee, or he may retain the fee and deed the right of flowage to others as a perpetual easement. It can only be acquired by an instrument in writing under seal in the nature of a deed of conveyance, or by prescription. In this case no question of prescription is involved. An omission by the riparian owner to make use of such right does not impair his title or confer any right thereto upon another. It is not the nonuser of the owner but the adverse enjoyment of it by another for the prescriptive period which may destroy his rights. *Townsend* v. *McDonald*, 12 N. Y. 381; *Pillsbury* v. *Moore*, 44 Me. 154; *Owen* v. *Field*, 102 Mass. 90.

Plaintiffs' counsel particularly insist that Schwartz's deed of September 5, 1911, to Mrs. Ross serves defendant no useful purpose in this litigation because the grantor made complete exception by specific description of the land in question here (by par. 5), which could not be re-annexed by the general words used in the concluding paragraph (7) purporting to convey all flowage rights, which counsel contend is "void for uncertainty." In support of this contention the following general rule from *Maxwell Land Grant Co.* v. *Dawson,* 151 U. S. 604 (14 Sup. Ct. 458), is quoted:

"An exception in a grant is said to withdraw from its operation some part or parcel of the thing granted, which, but for the exception, would have passed to the grantee under the general description. The effect in such cases in respect to the thing excepted is as though it had never been included in the deed."

To the extent wording in this lengthy deed calls for construction that rule may be conceded. It is also a general rule that in construing ambiguous or uncertain parts of an instrument the intent of the parties, if ascertainable, should govern. To that end we may also concede plaintiffs' further contention that the deed should be construed "with reference to the state of the property and what was in contemplation of the parties when the parties acquired their respective rights."

In his first deed to Mrs. Ross, Schwartz wandered somewhat in the wording of his reservation by first excepting from his grant "all flowage and riparian rights of every kind," followed by a restrictive declaration that it included any floodage from a dam having a 20-foot head, which would seem under the rule plaintiffs invoke to carry all right of flowage above that head to Mrs. Ross. But in her deed to Barrett she by tautology made her exception doubly certain,

reserving "all flowage and riparian rights of every kind including" what might be caused by a dam of any kind.

Whether in his deed of September 5, 1911, Schwartz unintentionally or by a "contemptible fraud" reserved his right to a 20-foot head flowage over this 4½ acres is primarily a question between the parties to the deed.    If he did, he in practical effect nullified not only any flowage right he had granted her to flood that small piece above his reserved 20 feet, but also destroyed the unlimited right of floodage he was pretending to grant her over other and adjacent lands bordering on the pond.    We do not think even the strict rules for construction of conveyances which plaintiffs invoke demand such a construction of this instrument.    Schwartz had sold and by this deed purported to convey to Mrs. Ross the water power plant which he owned with all rights, privileges and appurtenances belonging to it.    It is fairly apparent that by the exceptions in paragraph 5 he was attempting to exclude from his comprehensive descriptions of the property conveyed certain small tracts and rights previously disposed of.    One of these was the small tract in question which he had in the preceding spring deeded to Mrs. Ross with a reservation for his water power of a 20-foot easement of flowage.    While the exception itself does not as clearly express the full purpose as rules of careful conveyancing would suggest, as an indication of his intent he refers to it as land previously conveyed by him to Mrs. Ross, on May 1, 1911, and in a later paragraph (7) he distinctly conveys to her *all* his flowage and riparian rights, reiterated with his favorite word "including," which he had acquired by the trustee's deed in bankruptcy, which included this piece.    To one not technically trained in conveyancing his intention in that connection would seem fairly indicated.

In case of any repugnancy in different clauses of a deed all parts should be made to harmonize if practicable upon consideration of the whole instrument. Upon this subject it is said in 18 C. J. p. 267, citing supporting decisions:

"The strictness of the ancient rule as to repugnancy in deeds is much relaxed, so that in this as in other cases of construction if clauses or parts are conflicting or repugnant the intention is gathered from the whole instrument instead of from particular clauses, and if it is the clear intent of the grantor that apparently inconsistent provisions shall all stand, it will be given that effect if possible.    According to the trend of modern decisions, the technical rules of the common law as to the division of deeds into formal parts will not prevail as against the manifest intention of the parties as shown by the whole deed."

Viewing this instrument in its entirety, in the light of the circumstances leading up to and surrounding its execution, we are of opinion the trial court rightly construed it.

The judgment will stand affirmed.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, BIRD, and SHARPE, JJ., concurred.    MOORE, J., did not sit.